Argued January 6, reversed and remanded February 26, petition
for rehearing allowed April 23, petition for reconsideration of
rehearing denied with leave to renew May 15, reargued
June 2, former opinion withdrawn; decree affirmed
October 1, petition for rehearing denied Decem-
ber 19, 1969. Petition for writ of certiorari
and appeal denied by United States Su-
preme Court April 20, petition for
rehearing denied by United
States Supreme Court
June 1, 1970

LOWE ᴇᴛ ᴀʟ, *Respondents, v.* CITY OF
EUGENE ᴇᴛ ᴀʟ, *Defendants,*
EUGENE SAND & GRAVEL, INC.,
*Appellant.*

451 P. 2d 117
459 P. 2d 222
463 P. 2d 360

*William G. Wheatley,* Eugene, argued the cause for appellant. With him on the briefs were William E. Flinn, and Jaqua, Wheatley & Gardner, Eugene, and Warren Cameron, Special Counsel, Seattle, Washington.

*James P. Harrang,* Eugene, and *Leo Pfeffer,* New York, New York, argued the cause for respondents. With them on the brief was Barbara B. Aldave, Eugene.

Howard M. Feuerstein, Portland, filed a brief for American Civil Liberties Union of Oregon as amicus curiae.

Richard D. Curtis, and Hansen & Curtis, Eugene,

filed a brief for Leslie D. Erb et al, as citizens of the City of Eugene as amici curiae.

Before PERRY, Chief Justice, and McALLISTER, SLOAN, O'CONNELL, GOODWIN, DENECKE and LANGTRY, Justices.

LANGTRY, J. (Pro Tempore).

The crest of Skinner's Butte overlooks the City of Eugene and is within the city limits. It was donated to the city and for many years it has been maintained as a public park. From the late 1930's until 1964 successive wooden crosses were erected in this park, one replacing another as they deteriorated. These crosses were usually lighted at the Christmas and Easter seasons. One of the early crosses was large and neon-lighted. Construction of the first cross was motivated, at least in part, by a secular organization of physically handicapped people who received pleasure from looking out at the lighted cross. On November 28, 1964, defendant Eugene Sand & Gravel, Inc., with the aid of defendants Hamilton Electric and J. F. Oldham & Son, Inc., erected a prestressed concrete tapered Latin cross 51 feet tall on the property. The cross was equipped with inset neon tubing to provide lighting for the cross at the Christmas and Easter seasons. The plaintiffs in this declaratory judgment suit seek removal of this cross upon constitutional grounds.

It appears that no permission had been obtained from the city for erection of the earlier crosses. The city did not, however, interfere with any of the crosses —all were erected and maintained by the Eugene Chamber of Commerce and various individuals and other organizations at no expense to the city. No

permission was obtained from the city to erect the challenged cement cross. But on December 2, 1964, after the cross had been put up, a building permit and an electrical permit were applied for by Eugene Sand & Gravel and Hamilton Electric. On its application Eugene Sand & Gravel gave as its reason for erecting the cross the word "admiration." The applications were referred to the city council for approval and they became the subject of a highly publicized public hearing which was attended by an overflow crowd. At the conclusion of the hearing the council, by a 7 to 1 vote, issued the permits. The plaintiffs, who are voters and taxpayers of the city and members of various religious and nonreligious organizations, brought this declaratory judgment suit alleging violation of Art. I, §§ 2, 3, and 5 of the Oregon Constitution, and the First and Fourteenth Amendments to the U. S. Constitution. The city and the builders of the cross were named as defendants.

The defendant Eugene Sand & Gravel, Inc., in one of several affirmative answers, all of which were stricken by the court on plaintiffs' motion, asserted that the city has authority under its charter and the laws of Oregon to allow the erection and maintenance of the cross as a monument upon city park property. This defendant's amended answer, and answers by other defendants, joined issues solely upon the constitutional questions involved.

After an extensive trial, reported in an 883-page transcript, and thorough briefing of the case, the trial court handed down its written opinion in which it held that the cross is primarily a religious symbol and "only secondarily a memorial of or a monument to a vitally significant value system in the life and history of our nation and this community;" that the

charter of the city and the laws of Oregon do not specifically allow any private person to erect or maintain in the city park a permanent religious symbol; and that the city council or any private person has no authority to maintain the cross. These findings were in the formal findings of fact.

The court also found that the City of Eugene "did not authorize or consent to the erection of the cross." The court held as a legal conclusion that it could decide the case without reaching the constitutional questions. The basis of this conclusion was that the city had no specific authority under charter or statute to allow the cross in the park. The decree required removal of the cross.

The City of Eugene did not appeal from this decree, but Eugene Sand & Gravel, Inc., did appeal and relief has been stayed pending determination.

Eleven amici curiae, who are residents, voters, and taxpayers of the City of Eugene, joined the controversy when the city failed to appeal from the trial court decree. They have asserted that they represent the citizens of Eugene and they have filed a brief seeking reversal of the decree. The American Civil Liberties Union has filed a brief amicus curiae in support of plaintiffs' position.

■■ We think the trial court erred in holding that the constitutional questions could be avoided. The rationale of the trial court was that the city, either in its charter or state laws, had no specific authority to allow erection of a religious symbol in a city park. It is correct that if a constitutional question can be avoided by deciding a case on a non-constitutional issue courts will do so. *Elliott v. Oliver*, 22 Or 44, 29 P 1 (1892). But this rule is limited to a situation where the record in the case presents some other and

clear ground upon which the court may rest its judgment. 22 Or at 48. In the case at bar, the issue of city authority which defendants sought to raise in an affirmative answer was stricken by the court on plaintiffs' motion. The issues were then drawn solely on constitutional grounds in amended pleadings, and the record did not present the issue of the city authority. The constitutional questions must be decided.

These questions have been briefed and argued in depth by the contending parties and amici curiae in this appeal. The briefs present more than 650 citations of authority, texts, and statutes.

Two of the many precedents cited by counsel come close to being in point to the factual situation and law upon which this case must be decided. These are *State v. Morrison,* 57 So2d 238 (La 1952), cert. den., April 28, 1952; and *Paul v. Dade County,* 202 So2d 833 (Fla Ct App 1967), cert. den., Florida Supreme Court, 207 So2d 690, cert den., U. S. Supreme Court, 390 US 1041 (no opinion, Mr. Justice Douglas dissenting).

In *Morrison* a Catholic religious order presented to the City of New Orleans a statue of Mother Cabrini on which the following inscription appeared:

 " ' "St. Frances Xavier
 Mother Cabrini
 Erected August 25, 1949
 By The Order Of The Alhambra
 During Its 23rd Biennial Convention." ' "

This statue was placed upon public park property at no cost to the city and the city's authority to allow its placement there was challenged in a suit by a lay member of a Protestant religious sect. The statue of Mother Cabrini showed her in religious habit, wear-

ing a cross. She had done part of her charitable and church work in New Orleans. The Louisiana appellate court held:

> "It cannot be questioned that a municipality may permit the erection of statues and memorials in public places, whether they be purely ornamental or include the idea of a memorial * * *." 57 So2d at 247.[1]

The appellate court in its opinion approved the trial court's finding that there was no federal constitutional question involved "* * * since the erection of the statue here complained of cannot be held to be the establishment of a religion * * *." Reference was made to the pertinent provisions of the Louisiana Constitution which are quite similar to those respecting freedom and establishment of religion in the Oregon Constitution. The court took judicial notice of the existence of the many kinds of statues and monuments on public property in Louisiana and across the country which are religious in character, and then held:

> " 'The only restriction against the City is that

---

[1] As early as 1874, the then Supreme Court of New York held that:

> "Statues of men, and in commemoration of great public events, are now considered as the legitimate belongings of public places * * *. Cities * * * give abundant proof that statues, ornamental temples, obelisks, pillars and columns, have long been considered legitimate objects of public approval and admiration, and they are neither to be hid in a corner, nor placed where they cannot be seen." Tompkins v. Hodgson, 2 Hun 146 (NY 1874).

To the same effect see Parsons v. Van Wyck, 56 App Div 329, 67 NYS 1054 (1900); Vale v. City of San Bernardino, 109 Cal App 102, 292 P 689 (1930); Brahan v. City of Meridian, 111 Miss 30, 71 So 170 (1916).

> "* * * [T]he use of park lands for buildings or purposes which are incidental to its use as a public park are generally sustained, where the city retains control of the premises * * *." Rhyne, Municipal Law 473, § 21-7.

it cannot discriminate. That any statue or monu-ment might incidentally have some religious sig-nificance cannot be held violative of the constitu-tional prohibitions, unless it was designed and used as a public shrine or place of worship, or for the propagation of a religious belief; or was intended to hold some other religious group in public con-tempt and ridicule; or designed to cause religious strife and antagonisms.'" 57 So2d at 246.

The appeal in the second case, *Paul v. Dade County,* supra, which we consider to be more closely in point, was decided after the trial court in the case at bar made its decision and thus the trial judge did not have the benefit of its reasoning.[8]

The report of that case states that from 1955 to 1966 the Chamber of Commerce had erected a large cross consisting of lights on the side of the Dade County courthouse during the Christmas season. The county bore no part of the cost.

The practice of permitting the cross to be there was challenged by a non-Christian resident taxpayer.[9]

---

[8] The opinion of the trial court was rendered in this case on January 5, 1967. Paul v. Dade County, supra, was decided by the Florida Appellate Court on October 3, 1967, and certiorari was denied by the United States Supreme Court, 390 US 1041, on April 29, 1968. Appellant's brief indicates the pleadings of Paul v. Dade County and the trial court's decree therein were brought to the attention of the trial judge in the case at bar.

[9] The challenge was based upon the First Amendment to the United States Constitution, and upon Sections 5 and 6 of the Bill of Rights of the Florida Constitution. The latter sections are:

"Section 5. The free exercise and enjoyment of religious profession and worship shall for-ever be allowed in this State * * * but the liberty of conscience hereby secured shall not be so constrewed [sic] as to justify licentiousness or prac-tices subversive of, or inconsistent with, the peace or moral safety of the State or society.

"Sec. 6. No preference shall be given by law to any church, sect or mode of worship and no money shall ever be taken

The county admitted that it allowed the "Latin" cross upon the building and that such a Latin cross could be used as a religious symbol. But it asserted that crosses also have secular connotations and that the Latin cross on the courthouse had a secular connotation as a "yule" season decoration.

The defendants in the case at bar have made contentions similar to those made by Dade County. In this regard we noted above that the trial court in the case at bar found the cross to be "primarily a religious symbol," and "secondarily a memorial of or monument to a vitally significant value system in the life and history of our nation and this community." With these findings we do not disagree.

from the public treasury directly or indirectly in aid of any church, sect or religious denomination or in aid of any sectarian institution."

The section of the Louisiana Constitution construed in State v. Morrison, supra, is:

"Section 4. Every person has the natural right to worship God according to the dictates of his own conscience. No law shall be passed respecting an establishment of religion, nor prohibiting the free exercise thereof; nor shall any preference ever be given to, nor any discrimination made against, any church, sect or creed of religion, or any form of religious faith or worship." LSA Constitution, Art. I, § 4.

The sections of Article I of the Oregon Constitution plaintiffs claim to be violated are:

"Section 2. All men shall be secure in the Natural right, to worship Almighty God according to the dictates of their own consciences.

"Section 3. No law shall in any case whatever control the free exercise, and enjoyment of religeous (sic) opinions, or interfere with the rights of conscience.

"Section 5. No money shall be drawn from the Treasury for the benefit of any religeous (sic), or theological institution, nor shall any money be appropriated for the payment of any religeous (sic) services in either house of the Legislative Assembly."

In *Paul v. Dade County,* the court held:

"The applicable constitutional criterion, as we divine it, is that set forth by the United States Supreme Court in Abington Tp. School District v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963):

" '* * * The test may be stated as follows: what are the purpose and the primary effect of the enactment? If either is the advancement or inhibition of religion then the enactment exceeds the scope of legislative power as circumscribed by the Constitution. That is to say that to withstand the strictures of the Establishment Clause there must be a secular legislative purpose and a primary effect that neither advances nor inhibits religion. Everson v. Board of Education, [330 U.S. 1, 67 S. Ct. 504, 91 L.Ed. 711, 168 A.L.R. 1392, supra;] Mc-Gowan v. Maryland, supra, 366 U.S. [420] at 442, 81 S. Ct. [1101] at 1113-1114, 6 L.Ed.2d 393.' Id. at 374 U.S. 222, 83 S.Ct. 1571.

"It has also been observed that many symbols, though religious in origin, have ceased to have religious meanings *or have also acquired secular meanings.* See Abington Tp. School District v. Schempp, supra. For example, the dove, the star, the fish, and three interwined [sic] rings have all had, or presently may have, some religious symbolism attached thereto. On the other hand, some have also acquired certain secular meanings.

"The record does not indicate that this temporary string of lights forming a cross was used to support, aid, maintain or establish any religion or religious edifices. Its purpose was not to promote the participation by anyone in the affairs of any religious organizations or sect.

"Consequently, we hold that under the Schempp test, this does not amount to the establishment of a religion in violation of the First Amendment, and that it does not amount to a religious activity, controlled, supported or influenced by the govern-

ment as was found to exist in *Engel v. Vitale*, 370 U.S. 421, 82 S. Ct. 1261, 8 L.Ed.2d 601 (1962). See also: State ex rel. Singelmann v. Morrison, 1952 L.App., 57 So.2d 238." (Emphasis supplied.) 202 So2d at 835.

The Florida court referred to the lights as temporary in character; the cross in the case at bar is permanent in physical character. Obviously, however, a physically permanent structure such as this cross can be quickly removed. The *Dade County* cross was put up from 1955 to 1966, a total of twelve years. It was assuming the proportions of tradition, which suggests permanency. In this respect, the cross in the case at bar and the cross on the Dade County courthouse share the same characteristic.

■■ The trial court in the case at bar failed, apparently by oversight, to receive in evidence all of defendants' offered Exhibits 2 through 53. These exhibits, which we hold should have been received, are in the record and we are considering them. They indicate that many crosses and other religious symbols traditionally have been used as monuments and memorials upon public property throughout Oregon and the United States, without appellate court challenge except as noted in this opinion. This, in itself, is indicative of a feeling among a people who strongly support a constitutional government, that there is no constitutional question involved in such a case, or it is so minimal as not to merit notice. The evidence indicates that to many people the cross, whether it is a Latin cross or some other type, carries connotations that are not essentially religious in character and to such people it has primarily secular meanings. There is nothing in the evidence which reasonably supports an inference that the purpose of the defendants in erecting the cross

was to promote the participation by anyone in, or the advancement or inhibition of, any religious belief or organization, or that such was its primary effect. In *Dickman et al v. School Dist. 62C et al*, 232 Or 238, 247, 366 P2d 533 (1961), cert. den. 371 US 823, 83 S Ct 41, 9 L ed 2d 62 (1962), Mr. Justice O'CONNELL, speaking for this court, said:

"* * * A certain amount of interplay of influences exercised by state and church has been permitted. It is not difficult to cite examples. * * * [M]any * * * religious practices and connotations are found in the functioning of government, both state and federal."

We do not believe that the erection and maintenance of the cross in question amounts to a religious activity which violates the applicable provisions of the Oregon Constitution or the First and Fourteenth Amendments to the United States Constitution.

■ The official action of the City of Eugene in issuing the building and lighting permits for the cross a few days after it was erected, and after a widely publicized and well attended public hearing, constituted formal permission of the city for it to remain there at no cost to the city. Such a permit appears to be limited in that it is revocable in nature. 10 McQuillin, Municipal Corporations 183, § 28.53 (1966).

The conclusions of this opinion follow a study of the extensive evidence, assignments of error, answers, and arguments. Although not all of them have been mentioned in this opinion they have not been overlooked. The decree of the trial court is reversed and the case remanded for a decree to be entered consistent with this opinion.

DENECKE, J., specially concurring.

I concur in the majority decision that the constitutional issue must be decided and I further concur in the majority decision that neither the Constitution of Oregon nor the Constitution of the United States requires that the cross be removed. I believe I base my decision upon slightly different reasoning than that used by the majority.

I consider the problem as one arising under the "establishment clause" of the First Amendment, rather than under the "free exercise" clause. Therefore, I would pose the issue: Does the city foster the establishment of the Christian religion by permitting private persons to erect a cross in a city park and to light the cross during the Christmas and Easter season? In my opinion it does not.

In *Niemotko v. Maryland,* 340 US 268, 71 S Ct 325, 95 L Ed 267 (1951), the city Park Commissioner refused to give a Jehovah's Witnesses group a permit to hold Bible talks in a city park. The group held such a meeting without a permit and Niemotko, a member of the group, was arrested and later found guilty of disorderly conduct. The Court reviewed its early decisions and stated:

> "* * * In those cases this Court condemned statutes and ordinances which required that permits be obtained from local officials as a prerequisite to the use of public places, on the grounds that a license requirement constituted a prior restraint on freedom of speech, press and religion, and, in the absence of narrowly drawn, reasonable and definite standards for the officials to follow, must be invalid. * * *" 340 US at 271.

The Court found that the city had not given Niemotko a permit because the City Council disliked or disagreed

with the Witnesses' views. The conviction was reversed. The Court expressly rejected the argument, "that state and city officials should have the power to exclude religious groups, as such, from the use of the public parks." 340 US at 272.

*Fowler v. Rhode Island,* 345 US 67, 73 S Ct 526, 97 L Ed 828 (1953), similarly held Jehovah's Witnesses had a right to hold religious services in a city park where other religions were permitted to hold services. The holding rested upon the First and Fourteenth Amendments.

Both of these decisions concern the free exercise portion of the First Amendment; however, they accept without question the proposition that a city does not violate the establishment clause of the First Amendment by permitting religious groups to hold religious services in public parks. If a city can validly permit groups to hold religious services in parks, why can it not validly permit persons to erect a religious symbol, a cross, in a park?

The Establishment Clause prohibits the state, or any subdivision, from either aiding or appearing to aid the general cause of religion or any one religion. The appearance of fostering religion is to be prohibited as much as the actual fostering of religion: Both have a coercive effect.

Accepting the proposition that permitting religious services in a public park neither fosters nor appears to foster the establishment of religion, in my opinion issuing a revocable permit for the erection and the occasional lighting of a cross in a public park also does not foster or appear to foster the establishment of religion.

Whether the state action or permission appears to foster a religion is a question of degree. If the city had given a religious group a revocable permit to build a cathedral in the park, the appearance of city aid to religion would, in my opinion, be so strong as to require a decision that such permission was in aid of the establishment of religion and that, therefore, it was invalid. I do not believe permission to erect the Eugene cross falls into this category.

GOODWIN, J., dissenting.

As I understand the majority, the maintenance of the cross in a Eugene city park (a) is not a religious activity, or (b), if it is a religious activity, the city's participation in it is so insubstantial as to fall within the rule that the law does not notice trifles.

Much as I would like to join the majority and thus avoid an expression of disunity concerning this locally acrimonious confrontation between "procross" and "anticross" factions, the record compels me toward a different conclusion.

The display of the lighted cross during Christian festivals is at least concurrently a religious activity, even if one were to accept the somewhat labored argument of the proponents of the cross that the true motive for the display has been secular, i.e., the commercial exploitation of religious holidays. Indeed, the "procross" faction in this litigation has been embarrassed by its friends. Several witnesses innocently jeopardized the defense by references at the city council hearing to their religious reasons for wanting to keep the cross on display as a silent witness to their faith. Their statements reflected the popular sentiment at the time and place, and furnished ample proof, if any were needed, that the chief purpose of the dis-

play was religious. There is no doubt, from the record, that the mayor and council were responding to popular demand. It was to prevent this very kind of response to majority pressure, however, that the establishment clause of the First Amendment was written into our federal constitution. *Abington School Dist. v. Schempp,* 374 US 203, 83 S Ct 1560, 10 L Ed 2d 844 (1963).

Turning to our state constitution, and given the majority's acknowledgment that the cross display is that of a religious symbol, there is further reason to rebuke the city council. Government has no more right to place a public park at the disposal of the majority for a popular religious display than it would have, in response to a referendum vote, to put the lighted cross on the city hall steeple. The whole point of separation of church and state in a pluralistic society is to keep the majority from using its coercive power to obtain governmental aid for or against sectarian religious observances. See *Dickman et al v. School Dist. 62C et al,* 232 Or 238, 246-247, 366 P2d 533 (1961), cert. denied, 371 US 823 (1962).

Finally, I do not believe the difficult constitutional question is one that can be evaded by trivialization. The cross does not occupy a large tract of land, but it is permanent and it is conspicuous. Whether so intended by the city council or not, the city's participation in the display has placed the city officially and visibly on record in support of those who sought government sponsorship for their religious display.

For the foregoing reasons, I would affirm the judgment entered below.

McALLISTER and O'CONNELL, JJ., join in this dissenting opinion.

## ON REHEARING

John E. Jaqua and *William G. Wheatley,* Eugene, argued the cause for appellant on rehearing. On the brief opposing rehearing was William G. Wheatley, Eugene.

*Barbara B. Aldave,* Eugene, and *Leo Pfeffer,* New York, New York, argued the cause for respondents on rehearing. With them on the petition for rehearing and brief was James B. Harrang, Eugene.

Warren Cameron, Seattle, Wash., and Richard D. Curtis and Hansen, Curtis & Strickland, Eugene, filed a brief for Leslie D. Erb et al, citizens of the City of Eugene, as amici curiae.

Before PERRY, Chief Justice, and McALLISTER, SLOAN, O'CONNELL, GOODWIN, DENECKE and HOLMAN, Justices.

GOODWIN, J.

The trial court, in a suit for declaratory relief, ordered the City of Eugene and the other named defendants to remove from a public hilltop park a neon-lighted concrete cross some 50 feet tall which, when lit, was visible for several miles over a major part of the city of Eugene. On appeal, this court reversed the trial court's decree. The matter is before us again, on a petition for rehearing.

In a brief and upon oral argument, counsel challenged the propriety both of the granting of the rehearing and of the submission of the cause to a court that contained a justice who had not participated in the original decision.

On January 6, 1969, the original appeal was argued before a court consisting of Chief Justice PERRY and Justices MCALLISTER, SLOAN, O'CONNELL, GOODWIN, DENECKE and LANGTRY. In the absence of Justice HOLMAN, a regular member of the court, Justice LANGTRY was sitting as a Justice pro tempore duly assigned to this court pursuant to ORS 2.052.

The court handed down its original opinion on February 26, 1969, reversing the trial court. Justices PERRY, SLOAN, DENECKE and LANGTRY voted for reversal. Justices MCALLISTER, O'CONNELL and GOODWIN dissented. *Lowe v. City of Eugene*, 254 Or 518, 451 P2d 117 (1969).

The plaintiffs filed a petition for rehearing. On April 22, 1969, the court in its regular weekly conference considered the petition. Four of the regular justices who had participated in the original decision favored granting the petition. The other two regular justices and Justice LANGTRY opposed granting the petition. Since four of the regular justices who had participated in the original decision voted for a rehearing, it was unnecessary to decide whether Justice HOLMAN or Justice LANGTRY or neither of them or both of them should vote on the petition. The petition was granted.

The rehearing was set for June 2, 1969. On that date the cause was argued before the seven regular justices of the Supreme Court, none then being absent or disqualified. The court was thus convened according to the practice followed when a case is reargued in banc and no regular justice is disqualified. Justice LANGTRY had been appointed to serve for ninety days beginning the first judicial day in January, and his term had expired before June 2, 1969.

The submission of the cause on rehearing to the seven regular justices, including Justice HOLMAN, was correct.

The question whether a justice who did not participate in an original decision is barred from subsequent consideration of that case is potentially troublesome in any jurisdiction which allows rehearings. There are numerous reasons other than that of disqualification for a particular justice to be absent from a particular argument. Moreover, if the reason for the original absence was temporary, it is likely that the absent justice will be available for duty when the case is argued on rehearing.

Two lines of precedent in the United States deal with this situation.

In some jurisdictions a regularly elected justice who, for any reason, does not participate in an original decision does not participate in any subsequent considerations of that case. The reasons for the rule are set out in *Gas Products Co. v. Rankin*, 63 Mont 372, 207 P 993, 24 ALR 294 (1922) ; *Flaska v. State*, 51 NM 13, 177 P2d 174 (1946) ; *Cordner v. Cordner*, 91 Utah 474, 64 P2d 828 (1937) ; *Rohlfing v. Moses Akiona, Ltd.*, 45 Hawaii 440, 369 P2d 114 (1963) ; but cf. *Yoshizaki v. Hilo Hospital*, 50 Hawaii 40, 429 P2d 829 (1967).

In California, the court as it is constituted on the day a case is argued on rehearing is the Supreme Court for the purpose of the vote on the questions argued. A regularly elected justice who is present for duty and not disqualified hears argument and participates in the vote. See *Metropolitan Water Dist. v. Adams*, 19 Cal 2d 463, 122 P2d 257 (1942). Accord, *Glasser v. Essaness Theatres Corp.*, 346 Ill App 72,

89-100, 104 NE2d 510 (1952); *Battle v. Mason,* 293 P2d 324, 333-334 (Okla 1955).

We believe that the better reasoned cases are those which follow the California rule.

The institution of rehearing was invented and has survived because it is beneficial to the administration of justice. This court permits any party to file a petition for rehearing within 20 days following the publication of our opinion announcing a decision. Oregon Supreme Court Rule 47.

Every petition is carefully considered by the court. On any given date the court may be made up of seven justices who may not be the same seven who constituted the court the day, the week, or the month before. This change in the court's composition may be the result of many factors: e.g., illness, retirement, election. The court nonetheless votes and makes decisions as a court, not as a collection of individual justices.

■■ Both initially and upon rehearing, the parties have the right to a decision by a lawfully constituted court. They do not have a right to a decision by a particular judge or group of judges. In the case at bar, no decree has yet been placed beyond the power of this court to recall, modify or reverse; the cause is still pending. Until the time for rehearing has expired, the party in whose favor a decision is rendered has no vested right in the decision that would preclude its re-examination and vacation in the ordinary course of judicial administration. *Metropolitan Water Dist. v. Adams,* 19 Cal 2d at 475.

When the court, on June 2, 1969, heard argument on rehearing, Justice HOLMAN was present for duty, was not disqualified, and had both the right and the duty to vote on the merits of the case.

██ We hold, therefore: (1) that regardless of the number of justices available and qualified to vote, the petition for rehearing in this case was properly granted by a majority vote of a lawfully constituted court; (2) when the case came on in due course for argument on rehearing it was heard before a lawfully constituted court.

█ The majority of the court before which the case was argued on June 2, 1969, is of the opinion that the decree of the trial court should be affirmed for the reasons substantially as set forth in the dissenting opinion handed down on February 26, 1969. The former majority opinion handed down on February 26, 1969, is accordingly withdrawn. The decree entered below is affirmed. Neither party shall have costs in this court.

DENECKE, J., dissenting.

I concur in that part of the majority opinion approving the granting of the petition for rehearing and the procedure on rehearing. Upon the constitutional issue, however, I dissent for the reasons stated in my specially concurring opinion filed with our former decision.

PERRY, C. J., joins in this dissent.

ON PETITION FOR REHEARING

William G. Wheatley, and Jaqua, Wheatley & Gardner, Eugene, and Warren Cameron, Olympia, Washington, for the petition.

GOODWIN, J.

In an action for a declaratory judgment determining the constitutionality of the issuance by the City of Eugene of building permits for the erection of a cross on city-park property, the circuit court for Lane County entered a decree requiring removal of the cross. An appeal to this court was argued January 6, 1969; on February 26, 1969, this court reversed and remanded, with three judges dissenting. A petition for rehearing, filed April 22, 1969, was allowed, and the cause was argued on rehearing June 2, 1969. On October 1, 1969, this court, with two judges dissenting, withdrew its earlier majority opinion and affirmed the trial court by adopting in substance the previous dissent as the opinion of the court.

In a new petition for rehearing, the parties who

prevailed in the original opinion have listed a number of objections to the decision on rehearing. In granting the first rehearing and withdrawing the majority opinion of February 26, 1969, this court did not write a new opinion dealing point by point with the various arguments which had been discussed in the earlier majority and dissenting opinions. Perhaps this economy of words has misled the petitioners. It cannot be fairly asserted, however, that this litigation has suffered at any stage from inadequate debate or want of deliberation. Nonetheless, the new petition asserts that "newly discovered material matter" should be considered, and that new legal arguments are relevant to the proper disposition of the case and should be heard in a third oral argument.

The petition challenges our disposition of this case on three principal grounds: an alleged mistake as to the facts, an alleged misreading of the federal cases which have construed the First Amendment to the United States Constitution,[1] and an alleged misreading of the Oregon Constitution, Art I, §§ 2, 3, 4, 5, and 6.

■ First, as to the factual record, the petition is not well taken. The petition asserts that the only governmental act in support of the erection of the cross by private parties was the issuance of building and electrical wiring permits. This assertion overlooks the important fact that the city also turned over to private parties the city-maintained public land in which the cross was imbedded in concrete so that it would last,

---

[1] United States Constitution, Amendment 1:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

as one of the defendants testified, "forever." Other charges of factual inaccuracy in the opinion are equally unsupported by the record.

■ Turning to another argument urged in the petition, the proponents of the display seek to reopen the case for the purpose of introducing evidence that the public park atop Skinner's Butte in Eugene is a "War Memorial Park" and therefore is a fit site for a lighted cross regardless of reasons which might militate against such a display on other types of public lands or buildings. The petitioners' argument seems to be that because the park was dedicated to a secular purpose it must be assumed that a principally secular purpose motivated the city's participation in the display of the cross. This argument was made in the original trial, and all the evidence the petitioners now seek to have reconsidered was in the record which we examined when the case was first before us. The trial court decided that the secular purpose of the park dedication had no relevance to the city council's action then under review. We agree.

■ The war-memorial argument was never passed upon by the city council. The city's action in this case was taken, and defended during the trial below, primarily as an action taken by the city in response to the political power of the majority of the townspeople. At the trial, the city argued that the city council intended to aid the business community, some of whose members expressed a desire to display the cross in order to enhance the commercial exploitation of the principal Christian holidays: Christmas and Easter. The city's evidence tended to support this theory. At the same time, the record shows, a majority of the people in the community apparently viewed the display with approval because it reinforced their religi-

ous preference. These religious views also had been brought to bear upon the city government.

A majority of this court was of the opinion in October, and remains of the opinion now, that the allegedly commercial purposes behind the erection of the cross were, like the war-memorial argument, largely afterthoughts which were developed and embellished in response to this litigation.

The principal purpose which motivated the city council was its desire to conform to the desires of a majority of the citizens of the community, who conscientiously believed that their preferred religious symbol was entitled to preferential public display simply because the majority wished it so. Such a response to majority religious pressure is, of course, exactly what specific guarantees of rights in the state and federal constitutions were designed to prevent.

If the hilltop in question were private property, the petitioners and their supporters would be constitutionally entitled to erect their cross under the free-exercise clause of the First Amendment. However, the land is public, and its custodian is a governmental subdivision. This is the decisive factor.

Public land cannot be set apart for the permanent display of an essentially religious symbol when the display connotes government sponsorship. The employment of publicly owned and publicly maintained property for a highly visible display of the character of the cross in this case necessarily permits an inference of official endorsement of the general religious beliefs which underlie that symbol. Accordingly, persons who do not share those beliefs may feel that their own beliefs are stigmatized or officially deemed less worthy than those awarded the appearance of the city's endorsement. While government can foster edu-

cation in the history and cultural contributions of religions generally, and can act to protect the individual's right to his own personal expressions of religious opinion, the government has no business placing its power, prestige, or property at the disposal of private persons or groups either to aid or oppose any religion. *Epperson v. Arkansas,* 393 US 97, 89 S Ct 266, 21 L Ed 2d 228 (1968); *Abington School Dist. v. Schempp,* 374 US 203, 222-223, 83 S Ct 1560, 10 L Ed 2d 844 (1963); *Engel v. Vitale,* 370 US 421, 82 S Ct 1261, 8 L Ed 2d 601, 86 ALR2d 1285 (1962); *McCollum v. Board of Education,* 333 US 203, 68 S Ct 461, 92 L Ed 649, 2 ALR2d 1338 (1948).

It is, of course, far too late in the evolution of our federal constitution for the petitioners to overlook the protection which the religion clauses of the First Amendment give to nonreligious citizens and to citizens whose religious beliefs differ from those of the majority. *Torcaso v. Watkins,* 367 US 488, 81 S Ct 1680, 6 L Ed 2d 982 (1961). As it was expressed by Mr. Justice Jackson in *Board of Education v. Barnette,* 319 US 624, 642, 63 S Ct 1178, 87 L Ed 1628 (1943):

> "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion or other matters of opinion or for citizens to confess by word or act their faith therein * * *."

The present situation is easily distinguished from the public cemetery in which private persons are allowed to designate whether small crosses shall be placed over the graves of their relatives. In the case of the public cemetery, the presence of the individual cross is clearly a matter of individual preference. It

can be judicially noted that graves of non-Christians are not usually marked with Christian crosses.

Monuments to religiously motivated persons who become famous are also distinguishable from the type of display found in the case at bar. Statutes of noted religious persons are generally recognized as tributes to the individuals rather than to the religions for which they labored. Religion is, after all, a part of history. Consequently, a public monument to a famous American preacher or to a saint recognized by a church would perhaps be permissible, whereas a public monument depicting a biblical character or religious symbol would tend to sponsor the religion rather than to honor a famous person. In the case at bar, a large Latin cross which is lighted primarily during the Christmas season and Easter week is much more a testimonial to a religious faith than to a person. Those who argue that the cross is a mere secular symbol ignore 2,000 years of history.

Religious freedom and majority rule must live side by side. The majority, no matter how pure its intentions, has no right under our system of government to exert its political muscle to gain a preferred place for its testimony to its religious beliefs.

Lastly, the petition asserts that the majority of this court in adopting in substance the views expressed in the dissenting opinion filed on February 26, 1969, has misread the Oregon Constitution. The petition points out, as "newly discovered matter," the obvious fact that the Oregon Constitution contains no specific language duplicating the so-called Establishment Clause of the First Amendment to the United States Constitution.

The petition cites evidence available in the 1857 records of Oregon's constitutional debates that the

Bill of Rights of the Indiana State Constitution was used as a model for the Oregon Bill of Rights. Indiana's constitution contains an establishment, or "credal preference" clause.[2] Oregon's Bill of Rights does not. For some reason, our draftsmen did not carry the Indiana credal preference clause into our constitution. This unexplained omission might have constitutional significance if this court had rested its October 1, 1969, opinion in any degree upon the Indiana Constitution. It did not. The court was fully aware of the language of the Oregon Constitution.

 In discussing the constitutional principle of separation of church and state, this court was not engaged in word-matching between other constitutions and the Oregon Constitution. While neither a specific "establishment" clause nor a "credal preference" clause appears in our state constitution, it is obvious that the founders of this state did not intend to permit the state to sponsor any particular religion. When the draftsmen of the Oregon Constitution provided for the free exercise of religion, they also prohibited the use of public funds to support any preferred religious institution. Oregon Constitution, Art I, § 5.[3]

Petitioners argue, however, that the Oregon Constitution, in limiting its expression to a proscription against spending public "money" on religious insti-

---

[2] Indiana Constitution, Art I, § 4:

"No preference shall be given, by law, to any creed, religious society, or mode of worship; and no man shall be compelled to attend, erect, or support, any place of worship, or to maintain any ministry, against his consent."

[3] Oregon Constitution, Art I, § 5:

"No money shall be drawn from the Treasury for the benefit of any religeous (sic), or theological institution, nor shall any money be appropriated for the payment of any religeous (sic) services in either house of the Legislative Assembly.—"

tutions, by implication approved of turning over public land to them. This mechanistic interpretation of the state constitution is unwarranted. While differences between real and personal property of course have significance in a variety of legal contexts, these differences have no constitutional substance in a religious context.

We are, therefore, content to let stand our statement in the October 1 opinion, which grounded the decision on the merits in this case in part upon state as well as federal constitutional concepts. We did not intend to rely upon language which is not in our constitution. On the other hand, the language that is in the state constitution shows that the founders of this state did not intend to retreat from the federal position on separation of church and state, but rather intended to emphasize in their own words their own commitment to the doctrine of separation.

Every contention made by either side in this case has been fully examined, and a majority of this court remains convinced that the best interests of both government and religion are served by maintaining strict separation between the majority's political power and the majority's desire to foster its preferred religious faith. It is not the emblem of a religious belief which is objectionable under the state and federal constitutions; it is the enlistment of the hand of government to erect the religious emblem which offends the constitutions.

The petition for rehearing is denied.

DENECKE, J., dissenting.

I dissent upon the same ground as I dissented from the decision made after rehearing.

PERRY, C. J., joins in this dissent.