**PROTESTANTS AND OTHER AMERI-CANS UNITED FOR SEPARATION OF CHURCH AND STATE, C. Stanley Lowell, and Glenn L. Archer, Plaintiffs,**

v.

**Lawrence F. O'BRIEN, Postmaster General of the United States, Defendant.**

Civ. A. 1568–67.

United States District Court
District of Columbia.

Sept. 14, 1967.

Noel H. Thompson, Washington, D. C., for plaintiffs.

Leslie A. Nicholson, Department of Justice, Washington, D. C., for defendant.

## OPINION

HOLTZOFF, District Judge.

This is an action to enjoin the Postmaster General of the United States from issuing a commemorative Christmas postage stamp on the ground that the stamp portrays a painting of the Madonna and, therefore, has a religious significance. There are three plaintiffs: one is a corporation named "Protestants and Other Americans United for Separation of Church and State"; and the other two are private individuals. The plaintiffs' theory is that Government funds are being unconstitutionally expended in the issuance and sale of the postage stamp, and that they, the plaintiffs, are entitled to an injunction against the use of Government funds for purposes "of adoration and worship contrary to the religious beliefs of the plaintiffs". The plaintiffs do not show any injury to themselves separate and apart from other members of the public, or any violation of their individual legal rights. The defendant has moved to dismiss the action on the ground that the plaintiffs have no standing to sue. The plaintiffs have moved for a preliminary injunction. The two motions have been heard together and are now before the Court for decision.

The facts are not in dispute. The Post Office Department of the United States is engraving and printing, and proposes to issue during the Christmas season a five-cent commemorative Christmas postage stamp reproducing in miniature Hans Memling's famous painting of "Madonna and Child with Angels". The original painting now hangs in the National Gallery of Art in Washington, D. C. It is claimed in behalf of the plaintiffs that this postage stamp has a religious significance; that the likeness of the Madonna is a religious symbol commonly associated with the Roman Catholic Church; and that, therefore, for the Government to issue such a postage stamp violates the First Amendment to the Constitution.

The Postmaster General is vested with authority by statute to issue postage stamps. The statutory provision is found in 39 U.S.C. § 2501 and reads as follows:

"The Postmaster General may issue appropriate stamps in such denomination, form and design, and at such times as he deems necessary, for use in payment of postage or fees for special services."

There is no provision for judicial review of the administrative discretion of the Postmaster General in selecting designs for postage stamps.

A dispute over the image on a postage stamp seems hardly of sufficient magnitude to occupy the time and attention of the courts. This matter, standing alone, is within the scope of the maxim "de minimis non curat lex". Unfortunately, however, issues have been raised and presented in which there are lurking potential implications and far-reaching ramifications beyond the confines of this petty controversy. It becomes necessary, therefore, to devote consideration to the questions that confront the court out of all proportion to the insignificance of the minor and captious complaint filed by the plaintiffs.

The defendant moves to dismiss the action on the ground that the plaintiffs have no standing to sue. This objection is directed to an important question of law that affects the structure of the Federal Government and the functions of the Federal courts. It merits detailed discussion. Obviously the corporate plaintiff has no valid claim for relief, for no right of the corporate plaintiff has been invaded. As concerns the two individual plaintiffs, they purport to sue as members of the public to enjoin what they claim is an unconstitutional expenditure of public funds. They do not allege any personal right that has been violated, separate and apart from those of the rest of the public.

It is well settled that an individual may not maintain an action, on the theory that he is a taxpayer, to restrain an expenditure of public money, on the ground that allegedly it is unconstitutional or illegal. This principle was definitively established in the leading case of Frothingham v. Mellon, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078. There the plaintiff brought suit to restrain the disbursement of moneys under the so-called "Maternity Act", on the ground that the Act was unconstitutional and that under the guise of taxation the plaintiff's property would, therefore, be taken for the purposes of the statute without due process of law. In reaching the conclusion that a taxpayer may not maintain an action to restrain the payment of moneys on the ground that the expenditure would be unconstitutional or illegal, Mr. Justice Sutherland wrote as follows (p. 487, 43 S.Ct. p. 601):

"The administration of any statute, likely to produce additional taxation to be imposed upon a vast number of taxpayers, the extent of whose several liability is indefinite and constantly changing, is essentially a matter of public and not of individual concern. If one taxpayer may champion and litigate such a cause, then every other taxpayer may do the same, not only in respect of the statute here under review but also in respect of every other appropriation act and statute whose administration requires the outlay of public money, and whose validity may be questioned. The bare suggestion of such a result, with its attendant inconveniences, goes far to sustain the conclusion which we have reached, that a suit of this character cannot be maintained. It is of much significance that no precedent sustaining the right to maintain suits like this has been called to our attention, although, since the formation of the government, as an examination of the acts of Congress will disclose, a large number of statutes appropriating or involving the expenditure of moneys for non-federal purposes have been enacted and carried into effect."

On the authority of the *Frothingham* case, the Court of Appeals for this Circuit, in Elliott v. White, 57 App.D.C. 389, 23 F.2d 997, affirmed the dismissal of a bill in equity for an injunction to prohibit the Treasurer of the United States from disbursing Government funds appropriated for salaries of the chaplains of the Senate and House of Representatives and of the Army and Navy of the United States. The plaintiff, claiming that the employment of chaplains constituted a promotion of religion in violation of the First Amendment, sued as a citizen. The court held that the interest of a citizen in such an action is no more direct than that of a taxpayer, and ruled that the plaintiff had no standing to sue. In so doing, Mr. Justice Robb made the following observations (P. 390, 23 F.2d p. 998):

"Looking through forms of words to the substance of their complaint, it is merely that officials of the executive department of the government are executing and will execute an act of Congress asserted to be unconstitutional, and this we are asked to prevent. To do so would be not to decide a judicial controversy, but to assume a position of authority over the governmental acts of another and coequal department, an authority which plainly we do not possess."

This principle has been recently re-affirmed and applied by the Court of Appeals for this Circuit in Pauling v. McElroy, 107 U.S.App.D.C. 372, 278 F.2d 252, and Pauling v. McNamara, 118 U.S. App.D.C. 50, 331 F.2d 796.

The doctrine that a member of the public, whether suing as a taxpayer or as a citizen, whose individual legal rights are not affected separately and apart from the interests of the entire public, may not maintain an action to restrain the expenditure of public funds claimed to be unconstitutional or illegal, has been frequently applied in various situations. Leading decisions, following the *Frothingham* case, are Alabama Power Co. v. Ickes, 302 U.S. 464, 58 S.Ct. 300, 82 L.Ed. 374 and Perkins v. Lukens Steel Co., 310 U.S. 113, 60 S.Ct. 869, 84 L.Ed. 1108. In the last cited case, Mr. Justice Black stated (p. 125, 60 S.Ct. p. 876) that plaintiffs "to have standing in court, must show an injury or threat to a particular right of their own, as distinguished from the public's interest in the administration of the law." He explained the theory on which this rule is based as follows (p. 132, 60 S.Ct. p. 879):

"Our decision that the complaining companies lack standing to sue does not rest upon a mere formality. We rest it upon reasons deeply rooted in the constitutional divisions of authority in our system of Government and the impropriety of judicial interpretations of law at the instance of those who show no more than a mere possible injury to the public."

This principle is a necessary concomitant of the structure of the Federal Government. The framers of the Constitution established a Republican form of Government. The ultimate sovereignty lies in the people, who exercise their authority by means of the ballot in electing the Chief Executive and members of the Legislative branch, as well as thereby retaining the ultimate control over the process of amending the Constitution. The powers of the Government are divided among three coordinate branches, legislative, executive and judicial. None of the three is superior to either of the other two, and none of them may encroach on the powers of either of the other two. Unlike the legislative and the executive branches, the judicial branch consists of judges holding office by permanent tenure.

In order to effectuate this separation of powers, the jurisdiction of the Federal courts is limited to deciding only cases and controversies. If a justiciable case or controversy is properly presented, a judicial tribunal may interfere and accord a remedy for a violation of a private, personal right of the plaintiff, if the court finds that such a violation exists, provided that the private, personal right is separate and apart from the rights of the public generally. The Courts may not, however, control or supervise the operations of the other two branches of Government. Thus the courts may not interfere with the management of the internal affairs of either House of Congress, Trimble v. Johnston, D.C., 173 F.Supp. 651, or pass upon the qualifications of its members, Powell v. McCormack, D.C., 266 F.Supp. 354 (opinion by Hart, J.). So, too, the courts may not control, direct, supervise or interfere with the management, operation or activities of the departments or other agencies of the Executive branch of the Government, or of Governmental establishments, such as public schools, or public hospitals. Federal judges are not supervisors or overseers of Government agencies or institutions.

On this point Mr. Chief Justice Taney wrote as follows in Decatur v. Paulding, 14 Pet. 497, 516, 10 L.Ed. 559:

"The interference of the courts with the performance of the ordinary duties of the executive departments of the government, would be productive of nothing but mischief; and we are quite satisfied, that such a power was never intended to be given to them."

Courts may step in only on a showing that the private, personal legal rights of the individual claiming to be aggrieved have been infringed. The in-

dividual has no standing to sue in order to vindicate the rights of the public as distinguished from his individual grievance, if he has one of a legal nature.

In Frothingham v. Mellon, supra, 262 U.S. p. 488, 43 S.Ct. p. 601, this doctrine was formulated in the following manner:

> "The functions of government under our system are apportioned. To the legislative department has been committed the duty of making laws; to the executive the duty of executing them; and to the judiciary the duty of interpreting and applying them in cases properly brought before the courts. The general rule is that neither department may invade the province of the other and neither may control, direct or restrain the action of the other."

Mr. Justice Stone in his celebrated dissenting [1] opinion in United States v. Butler, 297 U.S. 1, 79, 87, 56 S.Ct. 312, 325, 329, 80 L.Ed. 477, eloquently enunciated these fundamental principles as follows:

> " * * * while unconstitutional exercise of power by the executive and legislative branches of the government is subject to judicial restraint, the only check upon our own exercise of power is our own sense of self-restraint."
>
> * * * * * *
>
> *"Courts are not the only agency of government that must be assumed to have capacity to govern."* (Emphasis supplied.)

This Court had occasion to discuss and apply the doctrine of separation of powers in different contexts in Trimble v. Johnston, D.C., 173 F.Supp. 651, and United States ex rel. Brookfield Construction Co. Inc. v. Stewart, D.C., 234 F.Supp. 94.

In this connection, it is desirable to advert to what is generally called the power of the judiciary to declare statutes unconstitutional. Actually, the courts do not have such a plenary authority. As was explained by Chief Justice Marshall with ineluctable logic and with the pre-cision of an Aristotelian syllogism in Marbury v. Madison, 1 Cranch 137, 176 et seq., 2 L.Ed. 60, the power of the judiciary is limited to determining justiciable cases and controversies, that is, controversies involving legal rights and liabilities as between individuals, or as between individuals and the Government. In adjudicating such a matter, the Court must first determine what is the pertinent rule of law. If both a statute and a constitutional provision appear to be applicable to the case before the court, and the statute conflicts with the constitutional provision, the latter must prevail and the court must determine the case according to the Constitution rather than in conformance with the statute. One of the results is that the court then concludes that the statute transgressed the Constitution. On the principle of *stare decisis*, such a ruling becomes a precedent if the same question arises in subsequent litigation. The court may not, however, declare a statute unconstitutional unless the question directly arises in connection with determining a justiciable case or controversy.

Mr. Chief Justice Marshall summarized his explanation of this subject as follows (pp. 177–178):

> "It is, emphatically, the province and duty of the judicial department, to say what the law is. Those who apply the rule to particular cases, must of necessity expound and interpret that rule. If two laws conflict with each other, the courts must decide on the operation of each. So, if a law be in opposition to the constitution; if both the law and the constitution apply to a particular case, so that the court must either decide that case, conformable to the law, disregarding the constitution; or conformable to the constitution, disregarding the law; the court must determine which of these conflicting rules governs the case: this is of the very essence of judicial duty. If then, the courts are to regard the constitution, and the constitution

---

I. Much of our constitutional law has been gradually derived from dissenting opinions of such eminent jurists as Justices Holmes, Stone and Cardozo.

is superior to any ordinary act of the legislature, the constitution, and not such ordinary act, must govern the case to which they both apply."

This doctrine was elaborated and expounded at considerable length in a more recent case, Muskrat v. United States, 219 U.S. 346, 31 S.Ct. 250, 55 L.Ed. 246. There the court had before it an Act of Congress that conferred jurisdiction on the Court of Claims and on the Supreme Court on appeal, to determine the validity of certain Acts of Congress. The Court held this statute unconstitutional insofar as it required of the Supreme Court action that was not judicial in its nature within the meaning of the Constitution. The Court discussed this topic in part as follows (p. 361, 31 S.Ct. p. 255):

> "Judicial power, * * * is the right to determine actual controversies arising between adverse litigants, duly instituted in courts of proper jurisdiction. The right to declare a law unconstitutional arises because an act of Congress relied upon by one or the other of such parties in determining their rights is in conflict with the fundamental law. The exercise of this, the most important and delicate duty of this court, is not given to it as a body with revisory power over the action of Congress, but because of the rights of the litigants in justiciable controversies require the court to choose between the fundamental law and a law purporting to be enacted within constitutional authority, but in fact beyond the power delegated to the legislative branch of the government."

■ We have discussed this matter in some detail with a view to ascertaining whether the question of the plaintiffs' capacity to sue comprehends much more than merely a rule of practice or procedure. We find that we are confronted with a vital feature of the Federal governmental structure and of the limitations that surround the powers of the judiciary, namely, that the judiciary may decide only cases or controversies. If a person has no standing to sue, he does not present a justiciable case or controversy.

If the courts had the general power on the application of any person to declare a statute unconstitutional; if the courts on the application of any person had the power to supervise, control, direct, oversee or interfere with the daily operations and management of the departments and agencies of the Executive branch of the government, or of governmental establishments, such as the public schools and public hospitals and in effect to substitute themselves for heads of governmental agencies, for school boards and for superintendents of hospitals; if the courts had the power to determine who is qualified to sit as a member of one of the Houses of Congress; the ultimate consequences would be appalling and destructive of our form of government. We would be lacking in clarity of thought if we did not realize that such a development would transform the judiciary from a coordinate branch into a superior and all powerful organ of the government. The supreme power of the government would then be lodged in the Federal courts, composed of judges holding by permanent tenure. Our government would cease to be a Republic. It would become a government by a small group of individuals holding office by permanent tenure.[2] Such a transformation of our popular form of government into one by a few, even if it comes gradually and imperceptibly may not be

2. Aristotle in his Treatise on Politics denominated a form of government in which more than one, but not many, rule as an aristocracy. He stated, Politics, Book III, Sec. vii:

> "Of forms of government in which one rules, we call that which regards the common interest, kingship or royalty; that in which more than one, but not many, rule, aristocracy; and it is so called, either because the rulers are the best men, or because they have at heart the best interests of the state and of the citizens. But when the citizens at large administer the state for the common interest, the government is called by the generic name—a constitution."

regarded with equanimity. It would destroy the constitutional edifice that the Founding Fathers erected and that the American people have cherished. It may be that if the process is slow and insidious, its progress would not be generally noticed or realized until it reached its consummation, but the process would nevertheless proceed to the great detriment of our political institutions.

We must heed Justice Stone's clarion call to the judiciary to exercise self-restraint and his admonition that the courts are not the only agency of government that must be assumed to have capacity to govern, United States v. Butler, supra.

■ The conclusion is inescapable that the discretion of the Postmaster General in selecting designs of postage stamps is not subject to judicial review; that the plaintiffs have not presented a justiciable case or controversy; that the plaintiffs have no standing to bring this suit; and that the defendant is entitled to a dismissal of the action.

This ruling would be sufficient as a final disposition of this case without regard to any other aspect. It is, however, often in the interest of sound and efficient judicial administration for a trial court to decide all principal points in a case. Moreover, in view of the unusual nature of this action, especially because it involves the religious clauses of the First Amendment, and because the plaintiffs argued that the action of the Postmaster General violated one of those basic constitutional provisions, it would be a somewhat unsatisfactory termination to this litigation if it were disposed of without any consideration of the merits. Such a conclusion might possibly

even give rise to doubts on the part of some as to whether the activity of which the plaintiffs complain is not in reality unconstitutional, but that there is no remedy against it. Such a line of thinking would be undesirable.

■ The Court, therefore, in addition to determining the preliminary question as to standing to sue, has examined and considered the merits of the plaintiffs' grievance. Plaintiffs' counsel argued that the issuance of the postage stamp in question was a form of proselytizing or publicizing a particular religion and, therefore, constituted an establishment of religion in violation of the Constitution. It is to be regretted that the Department of Justice rested solely on the preliminary question and presented no argument, either oral or written, on the merits. The Court, therefore, proceeded to make its own independent investigation and study of the problem, without any aid of the views of Government counsel.

The Constitutional provisions involved in this case are the following clauses of the First Amendment:

> "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; * * *."

It must be noted that the framers of the Constitution did not use the general phrase, "separation of church and State". They formulated the principles that they were enacting into the Constitution in a more specific and concrete form. Naturally, since we are dealing with constitutional provisions, the clauses in question, like every other provision of the Constitution, must receive a broad and liberal construction.[3]

---

3. Chief Justice Marshall in McCulloch v. Maryland, 4 Wheat. 316, 407, 4 L.Ed. 579, made the following celebrated statement:

"A constitution, to contain an accurate detail of all the subdivisions of which its great powers will admit, and of all the means by which they may be carried into execution, would partake of the prolixity of a legal code, and could scarcely be embraced by the human mind. * * * Its nature, therefore, requires, that only its great outlines should be marked, its important objects designated, and the minor ingredients which compose those objects, be deduced from the nature of the objects themselves. * * * we must never forget that it is a constitution we are expounding."

The Constitutional provisions that we are discussing consist of two distinct clauses and two separate aspects. The first clause that Congress "shall make no law respecting an establishment of religion" relates to the relation between church and State; the second, providing for "the free exercise thereof", guarantees complete religious liberty. Considering them in reverse order, the second clause extends to every religious group the right to maintain places for public worship, to conduct religious services and ceremonies according to its own ritual and to publicize its activities, without any Governmental interference. It guarantees to every person freedom of adhering to whatever faith he chooses, or not adhering to any; freedom to worship God in his own way, or not to worship Him at all; and freedom to advocate his religious views, if any, or to remain silent. Since this provision is not involved in the instant case, we need give no further consideration to it.

 The first clause that "Congress shall make no law respecting an establishment of religion" primarily precludes the creation of a State church, such as the Church of England, the Episcopal Church in Colonial Virginia, and the Congregational Church in Colonial Massachusetts. In view of the fact that all Constitutional provisions must receive a broad and liberal construction, what is prohibited to be done directly may not be achieved indirectly or partially. Thus no church may be financially supported by the government and no religion may be preferred by law or by governmental action over any other. No religious activities may be subsidized.[4] The government may not proselytize or conduct propaganda or publicity in favor of any religion. For example on the basis of a broad construction of the "establishment of religion" clause, the Supreme Court has outlawed an action of State educational authorities in composing an official prayer and requiring it to be recited in the public schools,

Engel v. Vitale, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601, and has barred devotional Bible reading and recitations of prayers in the public schools, School Dist. of Abington Township v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844; Chamberlin v. Dade County, Board of Public Construction, 377 U.S. 402, 84 S.Ct. 1272, 12 L.Ed.2d 407.

There are limits. The religious clauses of the First Amendment, like all other provisions of the Constitution, must be construed in the light of reason. While it is often said that the Constitution provided for "a separation of church and State", it did not, however, prescribe a separation of *religion* and State. The American people are a religious people. Religion is an inherent, permeating and pervading strain of our national life. It would be impossible to destroy, sever, or prevent every connection and every contact between religion and government, or to extirpate every trace and vestige of religion from government. Even if it were possible to attain such a strange result, it is highly doubtful whether the people would tolerate such a consummation.

Thus in Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711, the Supreme Court sustained the action of a local board of education which under authority of a State statute provided for reimbursement to parents of money expended by them for bus transportation of their children to school, even though part of this money was for payment of transportation of some children to Catholic parochial schools. Mr. Justice Black, speaking for a majority of the Court, made the following statement (p. 17, 67 S.Ct. p. 512):

"* * * we cannot say that the First Amendment prohibits New Jersey from spending tax-raised funds to pay the bus fares of parochial school pupils as a part of a general program under which it pays the fares of pupils attending public and other schools."

---

4. It may well be otherwise as to secular activities of religious establishments.

In Illinois ex rel. McCollum v. Board of Education, 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 648, the Supreme Court had banned a practice of a school board of permitting religious teachers employed by private religious groups, to come weekly into the school buildings during regular hours, and give religious instruction for a short period to those children whose parents desired them to receive it. The Court held that this practice constituted the use of school buildings for the promotion of specific religions. On the other hand, in Zorach v. Clauson, 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954, the Court declined to ban a practice of a school board of releasing pupils for specific periods during school hours on written requests of their parents in order that they might go to religious centers for religious instruction or devotional exercises. In that case the public school buildings were not used for religious purposes. The sole contact between religion and the schools was that pupils were released during school hours to proceed to a place where they would receive religious instruction. The churches participating in the program reported to the schools the names of children who were released from school but failed to appear for religious instruction. This course was necessary to avoid truancy. The discussion of this question by the Court in that case is helpful and illuminating. A part of it reads as follows (pp. 312–313, 72 S.Ct. p. 683):

"There is much talk of the separation of Church and State in the history of the Bill of Rights and in the decisions clustering around the First Amendment. * * * There cannot be the slightest doubt that the First Amendment reflects the philosophy that Church and State should be separated. And so far as interference with the 'free exercise' of religion and an 'establishment' of religion are concerned, the separation must be complete and unequivocal. The First Amendment within the scope of its coverage permits no exception; the prohibition is absolute. The First Amendment, however, does not say that in every and all respects there shall be a separation of Church and State. Rather, it studiously defines the manner, the specific ways, in which there shall be no concert or union or dependency one on the other. That is the common sense of the matter. Otherwise the state and religion would be aliens to each other —hostile, suspicious, and even unfriendly. * * * Municipalities would not be permitted to render police or fire protection to religious groups. Policemen who helped parishioners into their places of worship would violate the Constitution. Prayers in our legislative halls; the appeals to the Almighty in the messages of the Chief Executive; the proclamations making Thanksgiving Day a holiday; 'so help me God' in our courtroom oaths—these and all other references to the Almighty that run through our laws, our public rituals, our ceremonies would be flouting the First Amendment. A fastidious atheist or agnostic could even object to the supplication with which the Court opens each session: 'God save the United States and this Honorable Court'."

The history of the Republic discloses numerous and constant contacts between religion and the Government. It may be of interest to refer to a few. The Declaration of Independence expressly invokes the Deity several times. The Constitution provides for an oath of office to be taken by an incoming President. It is the universal practice to exempt Houses of Worship from taxation on real property. All Government office holders and employees take an oath of office. Affidavits are constantly used in government transactions. Oaths are administered to witnesses and jurors in the courts with an invocation to the Deity, and the Bible is frequently used for that purpose. Chaplains have been employed in the armed forces continuously from the early days

of the Republic.[5] Military and naval installations, as well as national cemeteries provide accommodations such as chapels, for religious services. Each House of Congress appoints a chaplain and opens every session with a prayer. There are chaplains in prisons, and religious services are conducted in penal institutions. The proclamation with which sessions of Federal courts are opened concludes with an invocation to the Deity. This is true of the Supreme Court. Other examples of contacts between religion and government may be found. None of the instances that have just been enumerated are barred by either of the two clauses of the First Amendment concerning religion. They do not involve an establishment of religion or any prohibition of the free exercise thereof.

The publication of a postage stamp, even if it consists of a design of religious significance, is likewise outside of the ban of either of the two restrictions on the powers of Government. It cannot be deemed in any sense even remotely connected with an establishment of religion, or with any limitation of the free exercise thereof. The suggestion of counsel that the reproduction of a painting of a Madonna on a postage stamp publicizes a particular religion and, therefore, is a form of proselytizing, is so remote and far-fetched as to be entitled to but scant consideration. It is clear that the Postmaster General does not violate the First Amendment of the Constitution by issuing the postage stamp under consideration.

The plaintiffs' motion for a preliminary injunction is denied. This opinion will constitute findings of fact and conclusions of law.

The defendant's motion to dismiss the complaint is granted.

5. An Act of March 3, 1791, 1 Stat. 223, fixed the salary of army chaplains at $50 a month. An Act of March 27, 1794, 1 Stat. 351, fixed the salary of Naval chaplains at $40 a month. The employment of chaplains in the armed forces does not appear to have been discontinued during the presidency of Thomas Jefferson or James Madison, even though they had been the leaders in the movement to disestablish the Episcopal Church in Virginia, and even though Madison was the principal author of the Bill of Rights.