Argued November 1, reversed December 16, 1976, petition for rehearing denied January 11, 1977

EUGENE SAND & GRAVEL, INC., *Petitioner,*
and
AMERICAN LEGION POST #3,
*Petitioner,*
*v.*
CITY OF EUGENE et al, *Respondents.*
(CA 4879, SC 24696)
558 P2d 338

*William G. Wheatley,* of Jaqua & Wheatley, Eugene, argued the cause and filed briefs for petitioner Eugene Sand & Gravel, Inc. With him on the reply brief were Dudley C. Walton, of Geddes, Walton & Richmond, Roseburg, and Larry R. Roloff, Eugene.

*Dudley C. Walton,* Assistant, Department of Judge Advocate, Department of Oregon American Legion, Roseburg, argued the cause for petitioner American Legion Post #3, Department of Oregon. With him on the brief was C. S. Emmons, Judge Advocate District #3, Department of Oregon American Legion, Albany.

*Leslie M. Swanson, Jr.,* Eugene, argued the cause for individual respondents. With him on the brief were Terence J. Hammons, of Hammons, Phillips & Hen-

sen, Cooperating Attorneys, American Civil Liberties Union of Oregon, Eugene.

Larry R. Roloff, Eugene, filed a brief Amicus Curiae for American Rights Council, Inc.

TONGUE, J.

**TONGUE, J.**

This is a suit in equity under ORS 16.460(1) to set aside a previous decree by this court upon the ground that "circumstances have changed materially" since the entry of that decree.

In 1969 this court held that the City of Eugene had violated the state and federal constitutions by authorizing the erection by private parties of a large cross on Skinner's Butte, a municipal park. *Lowe v. City of Eugene,* 254 Or 518, 451 P2d 117, 459 P2d 222, 463 P2d 360 (1969), cert denied, 397 US 1042, reh denied, 398 US 944 (1970). Our decision affirmed the decree of the Lane County Circuit Court ordering the removal of the cross from the park.

The cross has never been removed. In June 1970 plaintiff filed this suit. The amended complaint alleges that subsequent to our decision the circumstances have changed materially in that on May 26, 1970 a charter amendment was approved by the voters of the City of Eugene accepting the cross as a "memorial or monument to United States war veterans"[1] and that a deed of gift to the cross was delivered to and accepted by the city.

---

[1]That charter amendment is as follows:

"THE CITY OF EUGENE DOES ORDAIN AS FOLLOWS:

"BE IT ENACTED BY THE ELECTORS OF THE CITY OF EUGENE, OREGON, that Section 153 of Part I, Miscellaneous Provisions of the Eugene City Charter be and the same is hereby amended to add the following provisions thereto:

*"Section 1.* That the City of Eugene be and is hereby empowered, and by this Act does, accept a deed of the concrete structure in the form of a cross now located on the south slope of Skinner's Butte Park.

*"Section 2.* That the concrete cross structure shall remain at said location and in said form and·is hereby dedicated as a memorial and monument to the war veterans of all wars in which the United States has participated and that said memorial shall hereinafter be known as the "Veterans War Memorial Cross."

*"Section 3.* That the American Legion, Eugene Post No. 3 be and is hereby authorized at its own expense to prepare and affix to said structure a suitable and fitting plaque and other ornamentations consistent with the intendments of this act.

The City of Eugene, named as one of the defendants, filed an answer and cross-complaint admitting these allegations and also asking that the decree in *Lowe* be set aside. That answer also alleged that pursuant to the charter amendment the cross had been dedicated in a public ceremony as a "Veterans War Memorial Cross" by the American Legion and that a suitable plaque had been prepared by it and affixed to the cross.[2]

Mr. Raymond N. Lowe and the other individual defendants (who were the plaintiffs in *Lowe* and will be referred to as "defendants") demurred unsuccessfully to the complaint and cross-complaint and then filed an answer denying the allegations of change of circumstances (except for adoption of the charter amendment) and alleging affirmative defenses of res judicata and collateral estoppel.

The case was then tried in December 1974. On June 23, 1975 the trial court entered a decree dismissing the complaint. Plaintiff appealed from that decree. The Court of Appeals affirmed. 26 Or App 235, 552 P2d 596 (1976). A petition for review was then granted by this court.

In opposing the relief demanded by plaintiff and by the City of Eugene it is contended by defendants that the "real issue" is "whether the charter amendment transformed an essentially religious symbol into something secular"; that "as a matter of res judicata" (as a

---

"*Section 4.* That the control and lighting of said structure is hereby designated as a responsibility of the Park and Recreation Department of the City of Eugene and is hereby directed to light on appropriate days or seasons which fittingly represent the patriotic aspects, aspirations and sacrifice of war veterans, including but not limited to, Memorial Day, Independence Day, Thanksgiving, and the Christmas Season, and Veterans Day."

[2]The complaint also named as defendants the Mayor and members of the city council who joined with the City of Eugene in that answer and cross-complaint. American Legion Post No. 3 filed a complaint as intervenor also asking to set aside the decree in *Lowe v. City of Eugene,* 254 Or 518, 451 P2d 117, 459 P2d 222, 463 P2d 360 (1969), cert denied, 397 US 1042, reh denied, 398 US 944 (1970).

result of the decree in *Lowe*) "the cross was essentially a religious symbol" before the charter amendment; that it is an "erroneous assumption * * * that the acceptance of an essentially religious symbol as a memorial to war veterans somehow transforms the religious symbol to a secular status and meaning"; that to do so would ignore "2000 years of history" and that, as held in *Lowe,* a majority cannot thus "assert its political muscle to gain a preferred place for its testimony to its religious beliefs" because of rights guaranteed by the Constitutions of the United States and the State of Oregon. In support of these contentions reference is also made to testimony to the effect that many people in Eugene regarded the cross as "an essentially religious symbol" both before and after the charter amendment.

This is a proceeding in the nature of a bill of review. Although bills of review are abolished by ORS 16.460(1),[3] that statute authorizes a similar remedy by way of an original suit. In *Heatherly v. Hadley,* 4 Or 1, 8 (1869), the court described the grounds upon which relief may be obtained:

> "A bill of review, for which the Code now substitutes an original suit, was a bill filed to procure an alteration or reversal of a decree made in a former suit. It was requisite that a bill of review show either error in law appearing in the record * * * *or some new matter that has arisen in time after the decree,* or some discovery after the decree."[4] (Emphasis added)

---

[3] ORS 16.460(1) provides:

"Bills of revivor and bills of review, of whatever nature, exceptions for insufficiency, impertinence of irrelevancy, and cross-bills are abolished; but a decree in equity may be impeached and set aside, suspended, avoided or carried into execution by an original suit."

[4] We recognize, however, as stated in 3 Freeman, Judgments 2526-527, § 1216 (5th ed 1925):

"* * * 'A court of equity will never set aside or enjoin a judgment on the ground of error or mistake in the judgment of the court of law.' * * * for it is universally conceded that a court of equity will not interfere on the ground that in its decision the court of law or other judicial tribunal whose judgment is sought to be enjoined, committed error, whether of law or of fact."

■ Plaintiff and defendant City of Eugene rely upon what they claim to be a "change in the circumstances" under which the cross is now displayed, as compared with the circumstances under which it was displayed at the time in *Lowe,* as "new matter" sufficient to entitle them to demand that the decree in *Lowe* be set aside. In view of the nature of the issue that arises from this contention we hold that res judicata and collateral estoppel are not defenses in such a proceeding under ORS 16.460(1), assuming, of course, that plaintiff and defendant City have established sufficient "new matter."

We also disagree with defendants' contention that the "real issue" is "whether the charter amendment transformed an essentially religious symbol into something secular." Indeed, plaintiff and defendant City concede that the cross is a religious symbol.

We believe that the basic issue to be decided is not whether this cross was and still is a religious symbol. Instead, we believe the controlling issue to be whether the *display* of the cross on city-owned property under the circumstances existing at the time of the trial of this case, as compared with its display at the time of *Lowe* under the circumstances then existing, satisfies or fails to satsify the test established by the Supreme Court of the United States for application in such cases.

1. *The test of "purpose," "primary effect" and "entanglement."*

■ The test established by the Supreme Court of the United States for application in determining whether a law is constitutional under the First Amendment "Establishment Clause" is as follows: (1) the law must "reflect a clearly secular legislative purpose"; (2) it must "have a primary effect that neither advances nor inhibits religion" (as distinguished from an "incidental" effect); and (3) it must "avoid excessive govern-

[ 1012 ]

ment entanglement with religion."[5] We hold that this same test is also appropriate for application in determining whether a law is constitutional under similar provisions of the Oregon Constitution.[6]

■ It is important to bear in mind in the application of this test that this court has always recognized that there is a strong presumption of the constitutionality of all laws.[7] In the application of this test it is also important to bear in mind, as recognized by the Supreme Court of the United States, that the problem of determining the line between state neutrality to religion and state support of religion is "one of degree."[8] Also, as stated in *Zorach v. Clauson,* 343 US 306, 312-13 (1952):

"* * * The First Amendment * * * does not say that in every and all respects there shall be a separation of

[5] *Committee for Public Education v. Nyguist,* 413 US 756, 773 (1973). *See also Lemon v. Kurtzman,* 403 US 602, 612-13 (1971). *Cf. Abington School Dist. v. Schempp,* 374 US 203, 222 (1963).

[6] *Cf. City of Portland v. Thornton,* 174 Or 508, 149 P2d 972 (1944). *Cf. Lowe v. City of Eugene, supra* note 2 at 546-48.

The plaintiffs in *Lowe v. City of Eugene, supra* note 2, alleged violations of the First and Fourteenth Amendments of the Constitution of the United States and of Art I, §§ 2, 3 and 5 of the Constitution of Oregon.

The First Amendment of the Constitution of the United States provides:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof * * *."

The Fourteenth Amendment of that Constitution provides:

"* * * No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States * * *."

Article I, § 2 of the Constitution of Oregon provides:

"All men shall be secure in the natural right to worship Almighty God according to the dictates of their own consciences."

Article I, § 3, of that Constitution provides:

"No law shall in any case whatever control the free exercise, and enjoyment of religeous [sic] opinions, or interfere with the rights of conscience."

Article I, § 5 of that Constitution provides:

"No money shall be drawn from the treasury for the benefit of any religeous [sic] or theological institution * * *."

[7] *See Weinberger v. Rall,* 265 Or 597, 600, 510 P2d 549 (1973), and cases cited therein.

[8] *Board of Education v. Allen,* 392 US 236, 242 (1968).

Church and State. Rather, it studiously defines the manner, the specific ways, in which there shall be no concert or union or dependency one on the other. That is the common sense of the matter. Otherwise the state and religion would be aliens to each other—hostile, suspicious, and even unfriendly. * * * Prayers in our legislative halls; the appeals to the Almighty in the messages of the Chief Executive; the proclamations making Thanksgiving Day a holiday; 'So help me God' in our courtroom oaths'—these and all other references to the Almighty that run through our laws, our public rituals, our ceremonies would be flouting the First Amendment. A fastidious atheist or agnostic could even object to the supplication with which the Court opens each session: 'God save the United States and this Honorable Court.' "

To the same effect, as stated in *Walz v. Tax Commission,* 397 US 664, 669 (1970):

"* * * [T]here is room for play in the joints productive of a benevolent neutrality which will permit religious exercise to exist without sponsorship and without interference."

Also, as stated in *McCollum v. Board of Education,* 333 US 203, 256 (1948):

"* * * Devotion to the great principle of religious liberty should not lead us into a rigid interpretation of the constitutional guarantee that conflicts with the accepted habits of our people."

2. *"Circumstances" at the time of Lowe.*

In considering the validity of the contention by defendants that there has been no "change in the circumstances" since *Lowe* sufficient to require that its decree be set aside, the "circumstances" at the time of *Lowe* must also be considered, together with the evaluation of those circumstances by this court in *Lowe* in reaching that decision, i.e., what circumstances were considered by it to be controlling.

The "circumstances" at the time of *Lowe* included the following:

(1) A large concrete cross was erected in city park by a private party without permission from the city;

[ 1014 ]

(2) A building permit from the city was then sought and was issued by the city after a public hearing;

(3) No contention was made at that hearing that the cross was a "war memorial" and that contention was never considered or passed upon by the city council;

(4) That cross was "lighted" at Christmas and at Easter.

From the testimony in the trial of that case this court found that:

(1) The cross was a "religious symbol";

(2) The "chief purpose" of those who desired the display of the cross was "religious";

(3) The majority of people in the community at that time viewed its display with approval because it "reenforced their religious preference";

(4) The primary purpose of the city council in issuing the building permit was to conform to such desires by the majority; and

(5) The "war memorial argument" (which was not considered by the city council) was an "afterthought" in response to litigation.

This court in *Lowe* then held that the large concrete cross was a "religious symbol"; that its display during "Christmas festivals" was a "religious activity"; and that because the "chief purpose" of its display was "religious," the issuance by the city of a building permit to "set apart" public land for the display of such a "religious symbol" with such a "chief purpose" and as a "religious activity" was improper. In other words, the "purpose" test, as stated by the Supreme Court of the United States, was not satisfied. That holding was alone sufficient as a basis for the decision in *Lowe.*

■ Defendants, however, place great emphasis upon the fact that the majority in *Lowe* went further and said that "the mayor and council were responding to

public demand" and that the purpose of the First Amendment was to "prevent this very kind of response to majority pressure." In our judgment, that statement by the majority in *Lowe* was not necessary as a basis for its decision and did not provide an independent basis for that decision. Many laws which are held to be valid despite claims of unconstitutionality for violations of separation of church and state may initially have been sponsored by a "majority" and opposed by a "minority." The only proper basis for deciding the validity of such laws, however, is whether they satisfy the three-fold test of "purpose," "primary effect" and "entanglement." If they satisfy such a test, the fact that a "majority has imposed its views" on such a minority is, of itself, immaterial.

3. *Subsequent "changes in circumstances."*

In view of the basis for the decision in *Lowe* and the "circumstances" existing at that time, it is important to note the "circumstances" under which the cross was being displayed at the time of the trial in this case:

(1) Instead of being sponsored by a private party, as in 1964, the sponsorship for display of the cross in 1970 was the American Legion, a wholly secular organization;

(2) Instead of having a "religious purpose" as the "purpose" of those who desired the display of the cross in 1964, the purpose of the American Legion in 1970 was a secular purpose, i.e., the display of the cross as a memorial to all war veterans of all wars in which the United States has participated, to be known as the "Veteran's War Memorial Monument";

(3) Instead of seeking to authorize display of the cross by the obtaining of a building permit from a city council which never considered the purpose of the display to be as a war memorial, as in 1964, the authorization for its display was sought directly from the people of Eugene in 1970, and by a proposed charter amendment which specifically stated that the purpose of the display was to be as a war memorial;

(4) Instead of being displayed by being lighted only during the "religious festivals" of Christmas and Easter, as under the original proposal in 1964, that 1970 charter

[ 1016 ]

amendment provided that the cross be lighted "on appropriate days or seasons which fittingly represent the patriotic * * * sacrifice of war veterans," including the national holidays of Memorial Day, Independence Day, Veteran's Day, Thanksgiving and the Christmas season.

(5) Instead of being displayed on public property without designation as to its purpose, as in 1964, the 1970 charter amendment also provided that the American Legion, at its expense, prepare and affix to the cross a suitable "plaque * * * consistent with the intendments of this act";[9]

(6) It also appears that in 1970, pursuant to that charter amendment, an appropriate ceremony was conducted by the American Legion to dedicate the cross as the "Veteran's War Memorial Monument";

(7) Also pursuant to that amendment, memorial ceremonies have been subsequently conducted by the American Legion regularly at the site of the cross;

(8) Plans have also been made to place lettering on the crossbar of the cross reading:

"Bravely They Died, Honored They Rest."

Before considering the question whether a display of this cross on public property under these "changed circumstances" would satisfy the three-fold test of "purpose," "primary effect" and "entanglement" we believe that the problem as thus presented is placed in better perspective by first considering, based upon decisions by other courts involving displays of religious symbols on public property, what the holding of this court would be in the event that there had been no cross prior to the 1970 charter amendment and in the event that a new cross were proposed, constructed,

[9]That plaque reads as follows:
"VETERANS WAR MEMORIAL
MONUMENT
Dedicated July 4, 1970
IN MEMORIUM TO THOSE GALLANT
MEN AND WOMEN OF EUGENE
WHO FOUGHT AND DIED TO
KEEP OUR COUNTRY FREE
THIS PLAQUE PLACED HERE IN THEIR HONOR
BY AMERICAN LEGION EUGENE POST 3
AND WILLAMETTE WOMENS POST 161"

[ 1017 ]

maintained and displayed in Eugene, or in any other city, under these "circumstances," as they existed at the time of the trial of this case.

4. *Decisions by other courts permitting displays of "religious symbols" on public property.*

In some eight other cases involving the display of "religious symbols" on public property, the courts, both state and federal, have held such displays to be constitutionally permissible, at least under facts similar to those presented by the "changed circumstances" in this case and in several instances under far weaker facts. Those cases are as follows:

(1) *Meyer v. Oklahoma City,* 496 P2d 789 (Okla 1972), cert denied, 409 US 980 (1972) (50-foot permanent Latin cross, sponsored by Council of Churches, on public fairgrounds and maintained at public expense);

(2) *Anderson v. Salt Lake City Corporation,* 475 F2d 29 (10th Cir 1973) (monument inscribed with Ten Commandments on courthouse grounds);

(3) *Paul v. Dade County,* 202 So 2d 833 (Dist Ct App Fla 3d Dist) cert denied, 207 So 2d 690 (Fla 1967), cert denied, 390 US 1041 (1968) (lights in shape of Latin cross on courthouse during Christmas season);

(4) *Allen v. Morton,* 495 F2d 65 (DC Cir 1973) (nativity scene in federal park adjacent White House during Christmas season);

(5) *Lawrence v. Buchmueller,* 40 Misc 2d 300, 243 NYS2d 87 (S Ct Westchester County 1963) (nativity scene on public school property);

(6) *Baer v. Kolmorgen,* 14 Misc 2d 1015, 181 NYS2d 230 (S Ct Westchester County 1958) (nativity scene on public school property);

(7) *Opinions of the Justices,* 108 NH 97, 228 A2d 161 (1967) (plaques with the words "In God We Trust" in public schoolrooms);

(8) *State ex rel Singlemann v. Morrison,* 57 So 2d 238 (La Ct App) cert denied, 57 So 2d 238 (1952) (statue of nun in public park).[10]

In addition, the courts have held that national

[10] *See also* Note, Suffolk U L Rev 815, 825 n.49 (1974), and *see* Sorauf, The Wall of Separation 253, 289, 364 (1976).

mottos such as "In God We Trust" and "One Nation Under God" need not be removed from coins and currency issued by the federal government[11] and the pledge of allegiance to the United States[12] or from the national anthem,[13] and that a stamp issued by the federal government with a picture of the Madonna was not improper.[14]

It is suggested that to the extent that reliance is placed by plaintiff upon these decisions by other courts it is necessarily contended by plaintiff that this court decided *Lowe* "incorrectly" and that this court should reverse the decision in *Lowe,* which cannot be done on a petition for review based upon "new matter," as in this case. This misstates plaintiff's position.

Although plaintiff may believe that *Lowe* was decided incorrectly, plaintiff's position neither depends upon nor requires a reversal of *Lowe. Lowe* was decided in the light of the circumstances then existing and the validity and controlling effect of that decision is limited to those circumstances. Thus, the decision in *Lowe* is not binding on this court in a case involving the display of a cross in the park of another Oregon city under different circumstances. Neither is *Lowe* binding on this court in a petition for review based upon "new matter" if a sufficient "change in the circumstances" is proved.

Again, the question to be decided is whether the present circumstances are sufficiently different than those existing in *Lowe* so as to require that the decree in *Lowe* be set aside. In deciding that question, the decisions by other courts under similar, or even weaker, circumstances would appear to be at least persuasive, although not controlling.

---

[11] *Aronow v. United States,* 432 F2d 242 (9th Cir 1970).

[12] *Smith v. Denny,* 280 F Supp 651 (ED Calif 1968); *Lewis v. Allen,* 11 App Div 2d 447, 207 NYS2d 862 (3d Dept 1960), aff'd memo, 14 NY2d 867, 200 NE2d 767, 252 NYS2d 80, cert denied, 379 US 923 (1964).

[13] *Sheldon v. Fannin,* 221 F Supp 766 (D Ariz 1963).

[14] *Protestants and Other Amer. Unit. for Sep. of Ch. & St. v. O'Brien,* 272 F Supp 712 (D DC 1967).

## 5. *Application to present "circumstances" of test of "purpose," "primary effect," and "entanglement."*

■ Upon application to the present "circumstances" of the test of "purpose," "primary effect," and "entanglement" as stated by the Supreme Court of the United States,[15] we believe it to be clear that the display of a large cross in a public park as a veteran's war memorial under such circumstances does not violate constitutional requirements despite the fact that it is admittedly a religious symbol.

### (1) *"Purpose."*

Conceding that a large Latin cross is a religious symbol, it has been uniformly held that in determining the validity of the display of either a cross or a nativity scene on public property, the controlling question is not whether such a cross or nativity scene is a religious symbol, but whether the purpose of its display is religious or secular. Thus, the requirement of "purpose" is satisfied by displays of nativity scenes on public property in connection with the Christmas season as a secular festival or pageant.[16] Indeed, permanent displays of crosses and other religious monuments on public property have been uniformly held valid (except in *Lowe*) even when displayed in connection with a secular festival or event.[17]

Accordingly, we hold that when the American Legion sponsors the display of a cross in a city park as a memorial to war veterans, and when a city accepts such a cross as a war memorial, the requirement of a secular purpose is satisfied.

---

[15] See cases cited above, note 5, *supra.*

[16] *See Allen v. Morton,* 495 F2d 65 (DC Cir 1973); *Paul v. Dade County,* 202 So 2d 833 (Dist Ct App Fla 3d Dist), cert denied, 207 So 2d 690 (Fla 1967), cert denied, 390 US 1041 (1968); *Lawrence v. Buchmueller,* 40 Misc 2d 300, 243 NYS2d 87 (S Ct Westchester County 1963); and *Baer v. Kolmorgen,* 14 Misc 2d 1015, 181 NYS2d 230 (S Ct Westchester County 1958).

[17] *See Meyer v. Oklahoma City,* 496 P2d 789 (Okla 1972), cert denied, 409 US 980 (1972); *Anderson v. Salt Lake City Corporation,* 475 F2d 29 (10th Cir 1973); *Opinions of the Justices,* 108 NH 97, 228 A2d 161 (1967).

## (2) *"Primary effect."*

In order to satisfy this test it is necessary that the display of the religious symbol have a "primary effect" that neither advances nor inhibits religion, as distinguished from an "incidental effect." All of the cases cited above hold that the display of a religious symbol such as a cross, nativity scene, or crucifix on public property does not have a "primary effect" to either advance or inhibit religion. This is particularly true when the display is sponsored by a secular organization and during secular holidays, festivals or pageants.[18] Thus, although compulsory prayers in a public school would be held to have such a "primary effect," the passive display of a religious symbol in a public school may not have such a "primary effect."[19]

In this case the display of this cross is not only sponsored by the American Legion (a secular organization) as a Veteran's War Memorial (a secular purpose), but the requirements of the charter amendment, as adopted by vote of the people of Eugene, are that it be lighted only on secular national holidays, but not including Easter (a religious day, not a national holiday), as in the past. The charter amendment, as adopted by the people, also requires that the secular purpose of the display be made clear by an appropriate plaque, which has since been attached to the cross. In addition, the cross has been dedicated as a Veteran's War Memorial by appropriate public ceremonies sponsored by the American Legion and memorial services have subsequently been conducted regularly by it at that site.

We do not overlook defendants' contention that this is a large permanent cross on a butte overlooking the

---

[18]See cases cited above, notes 16 and 17, *supra.*

[19]*See Opinion of the Justices,* 108 NH 97, 228 A2d 161 (1967), and *Lawrence v. Buchmueller,* 40 Misc 2d 300, 243 NYS2d 87 (S Ct Westchester County 1963). *Cf. Chamberlin v. Dade County Bd. of Public Instruction,* 143 So 2d 21 (Fla 1962), vacated, 374 US 487, original opinion adhered to, 160 So 2d 97, rev'd in part and remanded, 377 US 402, reh denied, 379 US 871, aff'd in part, rev'd in part, 171 So 2d 535 (1965).

City of Eugene and is lighted on national holidays. We also do not overlook the testimony offered by defendants to the effect that many people in Eugene regarded this cross as "an essentially religious symbol" both before and after the charter amendment; that this cross is "offensive" to some non-Christians and that it is also "offensive" to some Christians as a "misuse" of a religious symbol.

Neither do we overlook testimony offered by plaintiff that there are many large monuments with crosses in military cemeteries, in addition to the use of crosses as individual grave markers, and that a monument with a cross is an appropriate symbol of sacrifice by men who gave their lives for their country in time of war.

We understand and respect these contentions and conflicting points of view. The issue in this case, however, is not whether this cross is a "religious symbol" or a symbol of "sacrifice," whether its display is permanent and prominent, or whether its display is "offensive," but whether the display of this cross has "a primary effect that neither advances nor inhibits religion." In deciding that issue it is our duty to consider all of the circumstances, including this testimony and these facts, and to strike what we consider to be a proper balance.

After considering all of these circumstances we hold, in accordance with what we believe to be decisions by other courts, that the display of this cross in a city park as a war memorial under these circumstances does not have a "primary effect" which either "advances" or "inhibits" religion.

(3) *"Entanglements."*

In order to satisfy this test, which is a comparatively new test, the display of the religious symbol on public property must involve no "excessive government entanglement." As held in *Allen v. Morton,* 495 F2d 65 (DC Cir 1973), the most recent and authoritative decision on this subject, this requirement is not

violated by the fact of payment by the government for maintenance of the display of a religious "symbol," although the requirement is violated if the government participates in an active manner in the planning and organization of activities which involve such a display. Because there is no evidence of such participation by the City of Eugene in connection with the planning or organization of any activities which involve the display of this cross, we hold that the fact that the cross is to be owned and maintained by the city is not alone sufficient to violate the test of "excessive government entanglement."

For all of these reasons, we hold that the display of this cross as a "Veteran's War Memorial" under the "circumstances" now existing conforms with the three-fold test established by the United States Supreme Court for application in determining whether the "Establishment Clause" of the Constitution of the United States has been violated. As previously stated, we also adopt this same test for the purpose of determining whether similar provisions of the Oregon Constitution have been violated.

6. *Defendants' contention that the charter amendment could not change the cross as a religious symbol or "undo" the history of this cross.*

Defendants would dismiss these "changed circumstances" and escape the effect of these decisions by other courts by contending that the charter amendment could not "change" the religious symbolism of the cross or "undo" the history of this particular case and that, according to testimony offered by defendants, many people in Eugene not only regarded this cross as a religious symbol at the time of *Lowe* and before the charter amendment, but continue to regard it as "essentially a religious symbol."

We believe this contention to be unsound for the following reasons:

(1) It is true that the "changed circumstances" have not changed this cross as a "religious symbol." That

much is conceded. That fact is not decisive of the case, however, because the issue is not whether the cross was, and still is, a religious symbol, but whether its *display on public property* is unconstitutional.

(2) Also, the question to be decided is not whether the display of the cross under the circumstances existing *at the time of Lowe* was unconstitutional, but whether the display of the cross at this time and under the "circumstances" now existing is unconstitutional.

(3) The contention that the changed circumstances cannot "change" the symbolism of the cross, or "undo" the history of this particular cross, would "prove too much" because if literally applied, and as applied by the defendants, it would mean that the passive display on public property of any religious symbol would be unconstitutional, so as to require its removal, if it can be shown that it is commonly regarded as a "religious symbol" and that at the inception of its display the constitutional test of "purpose," "primary effect" and "entanglement" was not fully satisfied. If this contention is correct, such a "history" would forever foreclose anything that could ever be done thereafter, by change of circumstances or otherwise, even though sufficient to otherwise fully satisfy these constitutional requirements. This would include not only monuments and war memorials in cemeteries and parks, but the display of any religious inscription on any public building or other property.

(4) More specifically, the decision by the United States Court of Appeals, District of Columbia Circuit, in *Allen v. Morton, supra,* the latest and most authoritative decision on this subject, deals with this problem. In *Allen,* a life-size nativity scene was displayed as a "creche" in a federal park adjacent to the White House during the Christmas season as a part of the Christmas "Pageant of Peace." It was clearly a "religious symbol." Washington Christian clergy were represented in the original organization of the pageant through the Archbishop of Washington and the

[ 1024 ]

Washington Federation of Churches. Officials representing the U.S. Park Service also served on the executive committee for the pageant. Government sponsorship of the pageant also appeared in written programs and in "plaques." These facts were all part and parcel of the "history" of the origin of the display of this nativity scene in a public park, as well as of the display itself over a course of several years.

Although disapproving the active sponsorship of and participation by the government in the display of this "religious symbol" in a public park, the court in *Allen* did not hold, as contended by the defendants in this case, that because of that "history" the display must be permanently discontinued and that the effect of that "history" was so pervasive that the constitutional deficiencies could never be cured.

On the contrary, it was held in *Allen v. Morton, supra* (at 75), that such a result was not "constitutionally required" and that these deficiencies could be "cured" for the purposes of future displays of that religious symbol by new regulations which would limit the "involvement" or "participation" by government by forbidding the government from participation in the sponsorship and conduct of the display so as to assure "neutral principles and criteria" that are "nondiscriminatory," accompanied by "appropriate plaques" to the same effect.

In reaching this conclusion the court applied the threefold test of "purpose," "primary effect," and "entanglement" and held that such a test was satisfied with the adoption of the newly required regulations and plaque.[20] In the course of reaching that conclusion the court held in *Allen v. Morton, supra* (at 69-70), that although the creche was "obviously a religious symbol" it was not used "to promote or profane any religion," but was "intended to be reverential to the religious heritage aspect of Christmas"; and (at 70-74) that upon application of the "balancing test," it

[20]For discussion of this decision see Note, 62 Georgetown LJ 1461 (1974), and Note, 8 Suffolk U L Rev, note 13, *supra*.

appeared that the display of the creche did not have a "primary effect" to "advance" or "inhibit" religion, but that its display "can have no more than a 'remote and incidental' effect advantageous to religious institutions." The court also held (at 74-76) that there would be no "excessive entanglement" by the government under the proposed new regulations, which assured "neutrality" by the government.

For all of these reasons, it is our opinion that under the "changed circumstances" in this case the present display of this cross, although admittedly a "religious symbol," is not unconstitutional because the present purpose of the display is secular; any "effect" to "advance" or "inhibit" religion is not "primary," but is no more than "remote and incidental," and, under the restrictions imposed by the charter amendment, there is no "excessive entanglement" by the City of Eugene.

Accordingly, we hold that the decree of the trial court in this case and the decision by the Court of Appeals affirming that decree must be reversed and that the decree as previously entered in *Lowe* must be set aside.

Reversed.

**DENECKE, C. J.,** dissenting.

I dissent for the reason that a majority of this court, rightly or wrongly, decided in 1969 that this same cross had to be removed. In my opinion, nothing has happened subsequently which affords any logical basis to set aside that decision, and the law is clear and settled that parties are not permitted to relitigate matters that have already been decided although the personnel of the court which previously decided the issue has changed.

This is a suit in equity pursuant to ORS 16.460(1) to set aside the decree in *Lowe v. City of Eugene,* 254 Or 518, 451 P2d 117, 459 P2d 222, 463 P2d 360 (1969), cert den 397 US 1042, 90 S Ct 1366, 25 L Ed2d 654,

rehr den 398 US 944, 90 S Ct 1838, 26 L Ed2d 283 (1970).

The suit cannot be maintained upon the ground that this court erred in deciding the *Lowe* case.[1]

"It has already been intimated that neither an erroneous conclusion upon which a judgment was based, nor any irregularity of proceeding not involving the jurisdiction of the tribunal pronouncing it, can have any effect in determining the question whether the judgment should be set aside or restrained in equity. Such, beyond doubt, is the law. 'A court of equity will never set aside or enjoin a judgment on the ground of error or mistake in the judgment of the court of law.' * * * for it is universally conceded that a court of equity will not interfere on the ground that in its decision the court of law or other judicial tribunal whose judgment is sought to be enjoined, committed error, whether of law or of fact." 3 Freeman, Judgments (5th ed) 2526-2527, § 1216.

A Comment to § 112, ch 5 of the Restatement of Judgments dealing with equitable relief from judgments states the policy underlying the quoted statement:

"Where a fair opportunity has been afforded to the parties to an action to litigate a claim in a court which has jurisdiction over them and over the cause of action and the court has finally decided the controversy, the interests of the State and of the parties require that the validity of the claim and any issue actually litigated in the action shall not again be litigated by them * * *." Restatement 532, Judgments § 112.

In 1969 this court by a vote of four to three, with one of the majority being a pro tempore Justice, reversed the trial court and held that the cross need not be removed. A petition for rehearing was granted. The seven regular members of the court sat on the rehearing and the former Justice pro tem did not. Five of the regular members of the court held the cross had to be removed. Two regular Justices dissented. With

---

[1] I dissented from the majority decision in *Lowe*; however, I am of the opinion that the correctness of that majority decision cannot be questioned in this case.

an opinion, the majority of five denied a petition for rehearing. The United States Supreme Court denied a petition for a writ of certiorari and appeal and a petition for rehearing. *Lowe v. City of Eugene,* supra (254 Or 518).

The majority of this court held in *Lowe v. City of Eugene,* supra (254 Or 518), that the City's permitting this particular cross to be erected and exhibited on City property was contrary to the first amendment to the Federal Constitution and several sections of Article I of the Oregon Constitution. The majority held that in the context of the erection and exhibition of this particular cross it was a religious symbol and the City's action in authorizing it to remain fostered the establishment of the Christian religion.

The holding in *Lowe* was based primarily on two considerations: (1) the essentially religious nature of the symbolism of the cross in our society, and (2) the connotations of government sponsorship of the Christian religion which resulted from the circumstances under which the City of Eugene approved the erection of this particular cross in its present location. The following excerpts illustrate the facts and considerations which were persuasive to a majority of the court:

"* * * Their statements [witnesses before the City Council] reflected the popular sentiment at the time and place, and furnished ample proof, if any were needed, that the chief purpose of the display was religious. There is no doubt, from the record, that the mayor and council were responding to popular demand. It was to prevent this very kind of response to majority pressure, however, that the establishment clause of the First Amendment was written into our federal constitution." 254 Or at 533.

"The principal purpose which motivated the city council was its desire to conform to the desires of a majority of the citizens of the community, who conscientiously believed that their preferred religious symbol was entitled to preferential public display simply because the majority wished it so. Such a response to majority religious pressure is, of course, exactly what

specific guarantees of rights in the state and federal constitutions were designed to prevent.

"* * * * *.

"Public land cannot be set apart for the permanent display of an essentially religious symbol when the display connotes government sponsorship. The employment of publicly owned and publicly maintained property for a highly visible display of the character of the cross in this case necessarily permits an inference of official endorsement of the general religious beliefs which underlie the symbol. * * *." 254 Or at 544.

The majority states the issue in this case: "* * * whether the *display* of the cross on city-owned property under the circumstances existing at the time of the trial of this case, as compared with its display at the time of *Lowe* under the circumstances then existing, satisfies or fails to satisfy the test established by the Supreme Court of the United States for application in such cases."

I am of the opinion, however, that the issue is not whether the present display of the cross meets the appropriate constitutional tests, but whether, in light of the decision and reasoning in *Lowe,* the circumstances have changed so drastically as to justify setting that decision aside.

The only change in circumstances is the amendment to the City Charter and the action taken pursuant to it. The amendment merely authorizes the City to accept the cross as a gift and designates it as a war memorial. It authorized an American Legion post to affix a suitable plaque to the cross and directed that the City light the cross on patriotic days.

The majority states that the significant changes wrought by the amendment are: (1) Now a Legion post, rather than a corporation, Eugene Sand & Gravel, Inc., is the sponsor of the cross; (2) Now the purpose of the Legion is to display it as a war memorial, whereas before the persons (which must refer to either the sponsor or the majority of the townspeople who per-

[ 1029 ]

suaded the City Council to permit the cross to be retained) desired it to be displayed for a religious purpose; (3) Now the government, speaking through the vote of a majority of the people, authorized its display as a war memorial, whereas the City Council previously did not consider whether it was a war memorial; (4) Now the cross must be lighted on patriotic days and Christmas; before it was customarily lighted on Easter and Christmas (there is no prohibition in the ordinance about lighting it at Easter); (5) Now a plaque shall be affixed stating its purpose; before nothing indicated its purpose; (6) The Legion had a dedication ceremony and conducts regular memorial ceremonies; and (7) Plans have been made to put appropriate words of memorial on the cross.

In *Lowe* this court held, in essence, that the "primary effect" of the City's action in permitting the cross to remain in the park was to foster the Christian religion and the City's action amounted to "excessive government entanglement with religion." The majority now holds in this case that because of the changes listed above that effect and entanglement have been completely changed. I do not believe that the shield with which the Bill of Rights protects the minority is so thin or that a decree of this court can be so easily bypassed.

O'Connell and Holman, JJ., join in this dissent.