Rosemary **GONZALES,** Harry **Levin, Louis Appleman, Melvin Schlesinger, and Richard Van Orman, Plaintiffs–Appellants,**

v.

**NORTH TOWNSHIP OF LAKE COUNTY, INDIANA, an Indiana Municipal Entity, and Horace Mamala, Individually and in his Capacity as Trustee of North Township, Defendants–Appellees.**

No. 92–3217.

United States Court of Appeals, Seventh Circuit.

Argued March 29, 1993.

Decided Sept. 10, 1993.

Gregory R. Lyman, Singleton, Crist, Patterson, Austgen & Lyman, Munster, IN, Ivan E. Bodensteiner (argued), Valparaiso, IN, and Richard A. Waples, Indianapolis, IN, for plaintiffs-appellants.

Anthony DeBonis, Jr. (argued), Smith & Debonis, East Chicago, IN, for defendants-appellees.

Robert B. Millner, Amy R. Small, Sonnenschein, Nath & Rosenthal; Sylvia Neil; and Judson H. Miner and Ellen Mayer, American Jewish Congress, Chicago, IL, for amicus curiae.

**1414**

Before BAUER, Chief Judge, ROVNER, Circuit Judge, and TIMBERS, Senior Circuit Judge.[1]

BAUER, Chief Judge.

Rosemary Gonzales, Louis Appleman, Harry Levin, Melvin Schlesinger, and Richard Van Orman sued North Township, a municipal entity in Lake County, Indiana, and Horace Mamala, the Township trustee. The plaintiffs allege that the Township violates the Establishment Clause of the First Amendment because it displays a crucifix in a public park. The parties filed cross motions for summary judgment. The district court dismissed all the plaintiffs but Appleman from the lawsuit for lack of standing and granted summary judgment in favor of the defendants. *Gonzales v. North Township of Lake County*, 800 F.Supp. 676 (N.D.Ind. 1992). The plaintiffs appeal those decisions. We reverse.

### I.

Wicker Memorial Park is located in North Township, near the city of Hammond, Indiana. Dedicated in 1927, the Park clubhouse displays a commemorative plaque that bears the inscription:

As the inhabitants of the North Township repair to this park in years to come, as they are reinvigorated in body and mind by its use, as they are moved by the memory of the heroic deeds of those to whom it is dedicated, may they become partakers and promoters of the more noble, more exalted, more inspired American life. Calvin Coolidge.

In 1955 a "memorial" was placed in the Park, ostensibly to honor the heroic deeds of servicemen who gave their life in battle.

The memorial was a crucifix. A crucifix is a depiction of a cross with the figure of Jesus nailed to it. *See* THE AMERICAN HERITAGE DICTIONARY 344 (2d College Ed.1991). The Wicker Park crucifix rises approximately 18 feet from the ground. The wooden cross is sixteen feet tall, sits on a two-foot base, and is nearly eight feet across. The terra cotta figure of Jesus nailed on the cross is six feet tall with arms that extend six feet across. The top of the crucifix is capped in bronze, and just beneath is mounted a plaque bearing the letters INRI. This abbreviation stands for *Iesus Nazarenus, Rex Iudaeorum*, or translated, Jesus of Nazareth, King of the Jews.[2] The crucifix is located in an area of the park which borders a busy intersection of Ridge Road and Highway 41. It is visible to virtually anyone who passes through the intersection. We have attached a photograph of the crucifix as Appendix A to this opinion.

For many years the crucifix had a plaque on its base. The plaque bore the following inscription:

For God and Country.

Dedicated to the memory of men and women whose love for this nation enabled them to make the supreme sacrifice of life itself in its defense. Presented by the Fourth Degree Knights of Columbus, October 16, 1955.

The plaque was less than two feet tall and was obscured by shrubs surrounding the base. In November 1983, Park officials discovered the plaque was missing, and for nearly ten years nothing has designated the crucifix as a war memorial.

The crucifix was erected in the Park by the Fourth Degree Knights of Columbus of the Abraham Lincoln General Assembly ("the Knights"). The Knights are a fraternal organization of Roman Catholic men. A Chicago Tribune article printed October 9, 1955, just before the crucifix was dedicated, reported that it was one of five similar statues that the Knights intended to erect near busy intersections throughout Northern Indiana. The article quoted a Knights spokesperson who stated that "the purpose of erecting the crucifixes was to remind motorists of the importance of religion in everyday life and 'to make Lake County [Indiana] the most God-fearing area in the mid-west.'" (R. 37, Exh. D). Another Knight stated: "The cross is a

---

1. The Honorable William H. Timbers, Senior Judge of the United States Court of Appeals for the Second Circuit, is sitting by designation.

2. *See* Matthew 27:37; Mark 15:26; Luke 23:38; and John 19:19.

symbol of Christianity and of our salvation. I do not remember it being any different.... We celebrate in all glory Christ's birth on Christmas, mourn His death upon the Cross on Good Friday, and hail with joy His Resurrection on Easter. And now, publicly, we hear protests against displaying a tribute to that same God." (R. 37, Exh. C, Att. 4).

A ceremony was scheduled to formally dedicate the "memorial". The featured speaker originally scheduled to give the dedication address was Rev. Pursley, auxiliary bishop of the Fort Wayne (Indiana) Catholic diocese. But Rev. Pursley did not attend, and instead a local attorney spoke. During his address, he talked about soldiers that died on behalf of the United States, but he also talked about how the nation was founded on principles "laid down by Christ" and that "Christ brought us brotherhood and that is why I am happy to be here today." (R. 37, Exh. C, Att. 5). Secular as well as Catholic groups participated in the ceremony. A mass that had been scheduled to follow the dedication was canceled. During the ceremony, the Knights deeded the cross to the Township. (R. 37, Exh. C).

Both before and after the dedication, several area ministerial associations sought to have the crucifix removed. Meetings were held to discuss the issue. At one of the meetings, a ministerial association issued a statement of its objections to the crucifix in the Park. The objections were twofold. First, it objected because "[t]he erection of such a religious memorial on public property is in violation of the revered American principle of the separation of Church and State." Second, it objected because "[t]he religious symbol which was erected with the intention of uniting our community in reality has proved divisive both between and within religious groups." (R. 37, Exh. C, Att. 7). Other ministerial associations protested that the crucifix should not be erected because it was a symbol of the Roman Catholic Church. (R. 37, Exh. C, Att. 3, 6). In response to the protests, the Township trustee told the press that in his opinion the crucifix was "not a symbol of one religion but of all Christianity." (R. 37, Exh. C., Att. 4). Apparently the

trustee was unaware of the fact that religions other than Christianity exist.

Despite the protests, the crucifix remained on display. For nearly thirty years, no formal move was made to remove it. Then in 1983, the plaintiffs sued to have the crucifix taken down. They base their lawsuit on two issues. First, as residents and taxpayers of North Township, they object to the Township's maintenance of the crucifix with taxpayer funds. Second, they object because their use and enjoyment of the Park has been adversely affected by the presence of the crucifix. They claim to have limited or virtually discontinued their use of this public area because they find the crucifix represents the Township's promotion of religion and, specifically, of Catholicism.

## II.

This case has lanquished for years. It was filed in the district court in June 1983, where it remained until September 1992 when an appeal was filed in this court. We now resolve the constitutional question, and remand to the district court to order the appropriate relief. The end of this protracted litigation should be at hand.

### A. The standing claim

█ The first issue we must address is whether the plaintiffs have standing to bring this suit. The United States Constitution requires that federal courts resolve only cases and controversies. U.S. CONST. art. III. Only a plaintiff with a personal stake in that case or controversy has standing. *Harris v. City of Zion*, 927 F.2d 1401 (7th Cir. 1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 3054, 120 L.Ed.2d 920 and *cert. denied sub nom. Rolling Meadows v. Kuhn,* —— U.S. ——, 112 S.Ct. 3025, 120 L.Ed.2d 897 (1992). This personal stake can be established only if the plaintiff has suffered an injury in fact. *Id.,* (citing *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975)). At the summary judgment stage, the plaintiff must produce evidence in the form of Fed.R.Civ.P. 56(e) affidavits or documents that support the injury allegation. *See United States v. Students Challenging Regulatory Agency Procedures (SCRAP),*

412 U.S. 669, 689, 93 S.Ct. 2405, 2416–17, 37 L.Ed.2d 254 (1973) (plaintiffs must show that injury allegations are not a sham to defend summary judgment motion); *see also Harris,* 927 F.2d at 1406 (same).

■ The plaintiffs identify themselves as long-term Township residents and taxpayers, and argue that the expenditure of taxpayer dollars for the crucifix gives them standing. Municipal taxpayers have standing to challenge tax dollar expenditures that allegedly contribute to Establishment Clause violations. *Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968); *Freedom From Religion Found, Inc. v. Zielke,* 845 F.2d 1463, 1470 (7th Cir.1988). In this case, however, the plaintiffs' claim is undercut by their inability to show that tax revenue is spent for the crucifix. The Township did not use government money to buy the crucifix (it was donated). The Township does not use government funds to maintain the crucifix (it just exists, maintenance free). And although Township funds are spent maintaining the Park areas surrounding the crucifix, this cost would be incurred with or without the presence of the crucifix. Without evidence of expenditure of tax revenues, the plaintiffs cannot claim standing by virtue of their taxpayer status. *American Civil Liberties Union v. City of St. Charles,* 794 F.2d 265, 267 (7th Cir.), *cert. denied* 479 U.S. 961, 107 S.Ct. 458, 93 L.Ed.2d 403 (1986).

■ The plaintiffs also claim they have standing based on the injury they have suffered because the presence of the crucifix in the Park infringes on their use and enjoyment of the Park and offends their moral and religious sensitivities. Offense to moral and religious sensitivities does not constitute an injury in fact and is insufficient to confer standing. *Harris,* 927 F.2d at 1405. Rather, the plaintiff must "incur a tangible, albeit small cost that validates the existence of genuine distress and warrants the invocation of federal jurisdiction." *Id.* at 1406. The Supreme Court has stated that " 'an identifiable trifle is enough for standing to fight out a question of principle; the trifle is the basis for standing and the principle supplies the motivation.' " *SCRAP,* 412 U.S. at 689 n. 14, 93 S.Ct. at 2417 n. 14 (quoting Davis, *Stand-*

*ing: Taxpayers and Others,* 35 U.Chi.L.Rev. 601, 613 (1968)).

To maintain standing, therefore, the plaintiffs needed to produce at least some evidence to support their alleged "use and enjoyment" injury. The district court considered the plaintiffs' depositions and interrogatories. Gonzales, Levin, Schlesinger and Van Orman stated that they avoid the area of the Park near the crucifix, but that they have not discontinued their use of other areas within the Park. The district court held that because they had not entirely discontinued their use of the Park they did not suffer an injury. The district court dismissed these plaintiffs from the lawsuit. (R. 80 p. 14). The court reached a different decision regarding the other plaintiff, Appleman. Appleman was a former Park employee who quit his job after the cross was erected and has gone to the Park on only three occasions since then. The district court determined that Appleman had, for all intents and purposes, discontinued his use of the Park, and that he suffered an injury in fact because he altered his behavior. The Township does not challenge the district court's finding that Appleman has standing.

■ Although one plaintiff with standing is all that is required to vest the court with jurisdiction, we must consider the other, dismissed, plaintiffs' claims that they have standing. If they do have standing, their presence in the lawsuit may affect issues of damages or equitable relief. *St. Charles,* 794 F.2d at 269. Appleman's standing vests us with jurisdiction, but we hold that the four other plaintiffs also have standing. Their claim that they avoid the area of the park where the crucifix is displayed because of its presence constitutes an injury in fact.

The district court indicated that a previous pattern of behavior needed to be interrupted or completely abandoned to show the plaintiffs were injured. We do not believe the plaintiffs' longstanding habits are a litmus test for standing in these situations, nor do we believe the plaintiffs must forego all use of the Park. For instance, in *SCRAP,* 412 U.S. 669, 93 S.Ct. 2405 the Supreme Court held that standing existed for plaintiffs who

alleged that their use and enjoyment of a national park was curtailed, but was not denied, due to the defendant's actions. *See id.,* at 685, 93 S.Ct. at 2415 (claim by users of natural resources that adverse environmental impact on national park caused by nonuse of recyclable goods was sufficient injury to withstand a motion to dismiss). Like the *SCRAP* plaintiffs, the plaintiffs here are users of Wicker Park, and their full use and enjoyment of the Park has been curtailed because of the defendants' display of the crucifix. This prohibition to their full use and enjoyment of the public park is an injury in fact, and we have indicated as much in prior Seventh Circuit decisions.

In *Doe v. Village of Crestwood,* 917 F.2d 1476 (7th Cir.1990), *cert. denied,* —— U.S. ——, 112 S.Ct. 3025, 120 L.Ed.2d 896 (1992), the plaintiff's injury was the denial of full use and enjoyment of a public festival area. In that case, the Village of Crestwood sponsored an Italian Festival on public property. As part of the festivities, the Village also sponsored a Roman Catholic Mass delivered in Italian. The Mass was to be conducted in a beer tent that at other times during the festival was used to serve its namesake beverage. The plaintiff sued to enjoin the Mass. The district court determined that the plaintiff had standing, and issued a temporary restraining order. We affirmed. We stated that the plaintiff's claim that he was denied access to the beer tent and would not attend the festival while the Mass was being conducted was sufficient to confer standing for his Establishment Clause challenge. *Id.* at 1478. We noted in a later decision that the *Crestwood* plaintiff's injury was "[h]ardly the kind of injury that would lead to a change in the very pattern of one's life." *Harris,* 927 F.2d at 1408. *See St. Charles,* 794 F.2d at 268 (being subjected to an involuntary audience with a religious symbol was an injury sufficient to confer standing in an Establishment Clause challenge).

Although Wicker Park encompasses approximately 336 acres and contains an eighteen hole golf course, tennis courts, an arcade, batting cages, a miniature golf course, a driving range, scenic walks, a pavilion, picnic grounds, volleyball courts, a social cen-

ter, a playground, jogging trials, and suitable locations for cross country skiing and ice skating, (R. 80 p. 25), denial of even a portion of the Park is an injury in fact. This is the sort of "identifiable trifle" that is sufficient to confer standing on those plaintiffs who were dismissed from the lawsuit.

## B. The Establishment Clause:

All the parties moved for summary judgment, which the district court granted to the defendants. We review motions for summary judgment *de novo* to determine if a genuine issue of material facts exists and whether the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–52, 106 S.Ct. 2505, 2510–12, 91 L.Ed.2d 202 (1986).

■ The Establishment Clause of the First Amendment controls the government's use of religious symbols. It states that "Congress shall make no law respecting an establishment of religion". U.S. CONST. amend. I., cl. 1. The Establishment Clause prevents the government from promoting or affiliating with any religious doctrine or organization, *County of Allegheny v. American Civil Liberties Union,* 492 U.S. 573, 590, 109 S.Ct. 3086, 3098, 106 L.Ed.2d 472 (1989), and "is a specific prohibition on forms of state intervention in religious affairs." *Lee v. Weisman,* —— U.S. ——, ——, 112 S.Ct. 2649, 2657, 120 L.Ed.2d 467 (1992).

Since 1971, the Supreme Court has generally analyzed alleged violations of the Establishment Clause in the framework of a three-part test set forth in *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). *See e.g., Edwards v. Aguillard,* 482 U.S. 578, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987); *Witters v. Washington Dept. of Services for the Blind,* 474 U.S. 481, 106 S.Ct. 748, 88 L.Ed.2d 846 (1986); *Grand Rapids School Dist. v. Ball,* 473 U.S. 373, 383, 105 S.Ct. 3216, 3222, 87 L.Ed.2d 267 (1985); *Mueller v. Allen,* 463 U.S. 388, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983); *Widmar v. Vincent,* 454 U.S. 263, 271, 102 S.Ct. 269, 275, 70 L.Ed.2d 440 (1981). Although the test is much maligned, the Supreme Court recently reminded us that *Lemon* is controlling precedent and should be the framework used by

courts when reviewing Establishment Clause challenges. *See Lamb's Chapel v. Center Moriches Union Free School Dist.,* —— U.S. ——, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993) (addressing defendant's use of a potential Establishment Clause violation as a defense to the allegation of a Free Speech violation). Writing separately in *Lamb's Chapel,* Justice Scalia took umbrage at the majority's invocation of the *Lemon* test, likening it to a "ghoul in a late-night horror movie that repeatedly sits up in its grave and shuffles abroad, after being repeatedly killed and buried" —— U.S. at ——, 113 S.Ct. at 2149. (Scalia, J. concurring in the judgment). In response, the majority noted that the proper method to inter an established decision is to overrule it, and that *"Lemon,* however frightening it might be to some, has not been overruled." *Id.* at —— n. 7, 113 S.Ct. at 2148 n. 7

■ We note that before we apply *Lemon,* we first must determine whether the challenged symbol is a religious one. The district court struck one of the plaintiffs' documents in support of their summary judgment motion that identified the crucifix as a religious symbol. (R. 80 p. 7). But we are masters of the obvious, and we know that the crucifix is a Christian symbol. We reached a similar conclusion about the Latin cross, acknowledging that it is "an unmistakable symbol of Christianity as practiced in this country today." [3] *Harris,* 927 F.2d at 1403. In fact, the crucifix is arguably the quintessential Christian symbol because it depicts Christ's death on the cross and recalls thoughts of his passion and death.[4] *St. Charles,* 794 F.2d at 273. Therefore, the crucifix must pass the *Lemon* test to remain standing in the Park.

■ That being said, *Lemon* instructs that in order to pass constitutional muster, the publicly displayed religious symbol must 1) have a secular purpose; 2) neither advance nor inhibit religion in its principal or primary effect; and 3) not foster an excessive entanglement with religion. *Lemon,* 403 U.S. at 612, 91 S.Ct. at 2111.

Justice O'Connor suggested a clarification of the first and second prongs of the *Lemon* test in a concurring opinion in another Establishment Clause case. She proposed that courts consider whether the disputed governmental act was meant to endorse, or has the effect of endorsing, religion. *Lynch v. Donnelly,* 465 U.S. 668, 687–94, 104 S.Ct. 1355, 1366–70, 79 L.Ed.2d 604 (1984) (O'Connor, J., concurring). This suggestion was adopted in *Allegheny,* and the Court reiterated that the prohibition of religious endorsement " 'preclude[s] government from conveying or attempting to convey a message that religion or a particular religious belief is *favored or preferred.*' " *Allegheny,* 492 U.S. at 593, 109 S.Ct. at 3101 (quoting *Wallace v. Jaffree,* 472 U.S. 38, 70, 105 S.Ct. 2479, 2497, 86 L.Ed.2d 29 (O'Connor, J., concurring in the judgment)). The concept of "endorsement" is fluid, and varies from case to case. *Id.*

As Justice Scalia noted in *Lamb's Chapel,* and as other Supreme Court decisions illustrate, the Court has avoided addressing the *Lemon* question, *see Lee v. Weisman,* —— U.S. at ——, 112 S.Ct. at 2655 (relying on "controlling precedents" in prayer in school and religious exercise cases when finding Establishment Clause violation), and has not always applied the *Lemon* test to Establishment Clause challenges. *See Marsh v. Chambers,* 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983) (relying on historical acceptance of salaried legislative chaplains and of prayer to open legislative sessions to find no Establishment Clause violation). In *Marsh,* the majority noted that the Eighth Circuit applied the *Lemon* test in its decision below, but when reversing, the Court neither applied nor mentioned the test. *Id.* In *Lee,* the majority intentionally avoided applying *Lemon. Lee,* —— U.S. at ——, 112 S.Ct. at 2655 ("We can decide the case without reconsidering the general constitutional framework by which public schools' efforts to accommodate religion are measured."). Both of those cases ignored another Supreme Court case, *Larson v. Valente,* 456 U.S. 228, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982), that

---

**3.** A Latin cross is one where the base stem is longer than the other three arms. *Harris,* 927 F.2d at 1403.

**4.** *See generally,* Matthew 27; Mark 15; Luke 23; and John 19.

determined a government tax exemption for religious organizations had to be struck down unless the government could justify it by proving it had a compelling interest in the offering the exemption. The *Larson* majority also applied the effect and the entanglement prongs of the *Lemon* test. *Id.* 456 U.S. at 251–55, 102 S.Ct. at 1686–89.

Most recently, the Supreme Court decided the Establishment Clause challenge in *Zobrest v. Catalina Foothills School Dist.,* —— U.S. ——, 113 S.Ct. 2462, 125 L.Ed.2d 1 (1993), without mention of the *Lemon* test. The *Zobrest* majority, however, relied on *Mueller v. Allen,* 463 U.S. 388, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983) and *Witters v. Washington Dept. of Services for the Blind,* 474 U.S. 481, 106 S.Ct. 748, 88 L.Ed.2d 846 (1986), and in both those cases, the decisions were reached using the *Lemon* framework. Moreover, none of the justices who wrote separately in *Witters* or *Mueller* suggested that *Lemon* should be overruled or ignored. We rely on the *Lemon* test, then, as the guide for our decision.

## C. The Lemon Test:

### 1. The crucifix and its secular purpose:

■ We will defer to a municipality's sincere articulation of a religious symbol's secular purpose. *See Edwards,* 482 U.S. at 587, 107 S.Ct. at 2579–80 (considering state's articulation of purpose for legislation). Nevertheless, the stated purpose cannot be a sham to avoid a potential Establishment Clause violation. *Id.; see American Civil Liberties Union v. Rabun,* 698 F.2d 1098, 1110 (11th Cir.1983) (an avowed secular purpose that is determined to be self-serving may not be sufficient to thwart an Establishment Clause challenge). The Township claims the crucifix was intended to act as a war memorial, not a religious icon, and that this purpose prevails. Several cases confronted this issue.[5]

The Eleventh Circuit is the only other federal circuit that has considered an analogous "cross" case. In *American Civil Liberties Union v. Rabun,* the court of appeals affirmed the district court's finding that a county owned and maintained a 35–foot by 26–foot cross that was erected out of " 'religious stirrings and for a religious purpose.' " 698 F.2d at 1110 (quoting the district court). The court held that the cross' presence in the public park violated the Establishment Clause. This decision came in spite of the county's claim that the cross was erected to promote tourism. The court found that this claim was a sham because the cross was scheduled to be completed by Easter, and was dedicated at an Easter sunrise service. Moreover, promotional materials about the cross contained inspirational messages. *Id.* at 1111. The Eleventh Circuit had an easier time with that case than did the Oregon Supreme Court in its analysis of a privately, and later, government, owned cross on public land.

In *Eugene Sand & Gravel, Inc. v. City of Eugene,* 276 Or. 1007, 558 P.2d 338 (1976), *cert. denied sub nom. Lowe v. Eugene Sand & Gravel,* 434 U.S. 876, 98 S.Ct. 226, 54 L.Ed.2d 155 (1977), the Oregon Supreme Court considered whether a large cross erected by private parties in a public park violated the Establishment Clause. The case appeared before the court on four occasions. The first time, the court determined that the cross did not violate the Establishment Clause, and reversed a lower court decree ordering the cross removed. One judge dissented. *Lowe v. City of Eugene,* 254 Or. 518, 451 P.2d 117 (1969). The second time, the court withdrew the first opinion and reheard the case. It then adopted the dissenting position, and affirmed the removal decree. *See Lowe v. City of Eugene,* 254 Or. 518, 463 P.2d 360, 361 (1969) (no opinion issued after

---

5. Other courts have considered similar questions under state law. *See Murphy v. Bilbray,* 990 F.2d 1518 (9th Cir.1993) (crosses placed in prominent locations in state parks violated California constitution); *Fox v. City of Los Angeles,* 22 Cal.3d 792, 150 Cal.Rptr. 867, 587 P.2d 663 (1978) (illuminated cross atop the city hall violated the California Constitution); *Meyer v. Oklahoma City,* 496 P.2d 789 (Okla.), *cert. denied,* 409 U.S. 980, 93

S.Ct. 314, 34 L.Ed.2d 244 (1972) (50–foot cross on city fair grounds does not violate Oklahoma constitution due to commercial nature of the surrounding environment); *Paul v. Dade County,* 202 So.2d 833 (Fla.Dist.Ct.App.1967), *cert. denied,* 390 U.S. 1041, 88 S.Ct. 1636, 20 L.Ed.2d 304 (1968) (string of lights forming cross mounted on courthouse does not violate Florida or United States constitution).

rehearing). The third time, the court reaffirmed that the alleged commercial purposes and war memorial designation given for the cross were afterthoughts and that they did not give the cross a secular purpose. The opinion clarified the reasons the first decision had been vacated and reversed. *Id.*

After all the wrangling, the cross had yet to be removed. Instead, the American Legion (the private owner) deeded the cross to the city as a gift, and the city counsel passed a charter amendment accepting the cross as memorial to United States war veterans. The amendment also provided that the American Legion was to donate a plaque for the cross designating it as a war memorial and that the cross was to be illuminated on holidays that were linked with war veterans, including Christmas. A second lawsuit was filed, and worked its way back to the top of the state's judicial system. The Oregon Supreme Court took a fourth bite of the apple, and held that the change in circumstances allowed the city to avoid Establishment Clause violations.[6] *Eugene Sand,* 558 P.2d at 340–49.

In another case, a district court in Texas also considered whether a cross designated as a war memorial violated the Establishment Clause. *American Civil Liberties Union v. Eckels,* 589 F.Supp. 222 (S.D.Tex. 1984). In *Eckels,* the county commissioner authorized and organized the placement of three Latin crosses in a section of a public park to be used as a "meditation" area. The crosses were placed in a row on a knoll, and the center cross was a larger than the two flanking it.[7] After some protest, a Star of David was also placed in the meditation area. After the lawsuit was filed seeking removal of the crosses and star, the Commissioner requested and received permission to have the monuments designated as war memorials. Despite this designation, the Commissioner later sought help from the clergy in an effort to retain the monument and to reinstill in America the values that she has "deserted to her peril." *Id.,* at 225 n. 3. No mention

was made of the monument's purported significance as a war memorial.

The *Eckels* court applied three different tests employed by the Supreme Court. First, it applied *Lemon,* and held that the "war memorial" violated both the purpose and the effect prongs of the test. The court found that the county commissioner's petition for assistance to the clergy, and his admissions that the expenditures of county funds for the symbols violated the constitution, proved that the memorialization was merely a post-hoc rationalization for the crosses and the star. *Eckels,* 589 F.Supp. at 233–37. The court next applied the *Marsh* reasoning, analyzing whether history, tradition, or the framers' intent indicated that the cross would be acceptable despite the Establishment Clause prohibitions. The court found "a complete lack of evidence that our founding fathers were aware of the practice of placing crosses or Stars of David in public parks" for meditative or war memorial purposes. *Id.,* at 237. Finally, the court applied the "compelling interest" reasoning found in *Larson,* and determined that under strict scrutiny, the two purposes advanced for the monuments were not compelling. *Id.,* at 238.

Despite the third decision in *Eugene Sand,* and the *Eckels* decision, both which held that a later-stated purpose for the religious symbol could not alleviate a constitutional violation, a district court in the District of Columbia held that it could. In that case, the district court determined that even if the original purpose of a 65–foot cross displayed at Camp Smith military base outside Honolulu was not to serve as a war memorial, at the time of litigation the cross was a "nonsectarian symbol of our national resolve to obtain a full accounting of American servicemen still missing or unaccounted for in Southeast Asia." *Jewish War Veterans v. United States,* 695 F.Supp. 3, 12 (D.D.C.1988). Accepting the government's post-hoc rationalization, the district court held that because it could discern a plausible secular purpose for the cross, it passed the first prong of the

---

**6.** The plaque was not affixed to the cross at the time a second lawsuit was filed seeking removal of the cross. The plaque was hung, however, before the case was decided.

**7.** This arrangement mimics the scene of the crucifixion on Golgotha. *See* Matthew 27:38; Mark 15:27; Luke 23:33; John 19:17.

*Lemon* test. *Id.* (the cross failed the second prong, *see infra*).

Another court also found that a cross had a secular purpose, using arguably similar reasoning. In *Carpenter v. City and County of San Francisco*, 803 F.Supp. 337 (N.D.Cal. 1992), a district court in California held that a large Latin cross, owned by a city and erected in a public park for purposes similar to those in *Eckels*, did not violate the Establishment Clause. There, a local YMCA director, who was an active Episcopalian, proposed the erection of a Latin cross in a city-owned park in San Francisco. The city agreed, and placed a 103–foot by 36–foot concrete cross in Mount Davidson Park. The city claimed that it intended to put a work of art in a park that was an ideal place for contemplation. The district court acknowledged that the erection of the cross was motivated by a private person with a religious purpose, but distinguished that purpose from the city's. The court found that the city's purpose was ostensibly to create a public monument and work of art, not to endorse religion. The district court determined that the cross passed the first prong of the *Lemon* test. *Id.* at 348.

The *Carpenter* reasoning is not especially persuasive. When a religious symbol is erected for a religious purpose, the fact that it is also a "work of art" designed by a noted architect and approved by an art commission does not change its purpose. It simply is an attempt to create an aesthetically pleasing religious symbol; it does not obviate its religious purpose.

■■■ After considering these different approaches, we believe that the Eleventh Circuit's and the Texas district court's reasoning present the most sound application of Establishment Clause jurisprudence. In this case, the purpose behind the display of the Wicker Park crucifix arises from religious stirrings like those the Eleventh Circuit found in *Rabun*. The record illustrates that the Knights' goal was to spread the Christian message throughout Lake County, Indiana. The historical documents, as well as the nature of the monument, convey the unassailable im-

pression that memorializing the crucifix was simply a means to this end. The Township's claim that the war memorial purpose is the primary reason the crucifix is displayed is unpersuasive. We can imagine no secular purpose served by a crucifix that is free from any designation or memorialization. Moreover, the Township has offered no evidence to show that the crucifix has ever been used for memorial purposes. We believe the evidence contradicts the Township's statement of purpose and that, indeed, the religious symbol here was not intended to, and does not now, serve a secular purpose.

Although the facts in this case are similar to the facts in *Eugene Sand*, the resolution is not. As in that case, private parties erected a religious symbol in a public park then donated it to the government and designated it a war memorial. In both cases a plaque was supposed to be attached to the symbol identifying it as a war memorial. Whereas the Oregon Supreme Court held that these circumstances changed the primary purpose and effect of the cross from religious to secular, we cannot reach a similar holding here.[8] We find that *Lemon* does not permit a municipality to exempt a obviously religious symbol from constitutional strictures by attaching a sign dedicating the symbol to our honored dead. Our reasoning echoes that of the *Rabun* and the *Eckels* courts that determined that religious purposes inspired the addition of the religious symbols to the public parks.

*2. The crucifix's advancement or inhibition of religion in its principal or primary effect:*

The message conveyed by a religious symbol determines whether it advances or inhibits religion in its principal or primary effect. *Allegheny*, 492 U.S. at 593, 109 S.Ct. at 3100–01. If the message is a government endorsement or advancement of religion the symbol has failed the *Lemon* test. The context in which the religious symbol is displayed may affect the message. For instance, the display of a creche might advance or endorse

---

**8.** The Oregon Supreme Court in *Eugene Sand* appeared to blend the secular purpose and secu-

lar effect tests. We find its reasoning suspect. *Eugene Sand,* 558 P.2d at 347.

religion only in certain settings. *Compare Lynch,* 465 U.S. 668, 104 S.Ct. 1355 (display of government owned créche in a setting among secular holiday decorations does not violate Establishment Clause), *with Allegheny,* 492 U.S. 573, 109 S.Ct. 3086 (display of créche in main area of county courthouse, free from secular decorations and donated by religious society violates Establishment Clause). *Cf. Meyer v. Oklahoma City,* 496 P.2d 789, 792 (Okla.), *cert. denied* 409 U.S. 980, 93 S.Ct. 314, 34 L.Ed.2d 244 (1972) (rejecting a church/state claim on state constitutional grounds and holding that fairgrounds where a cross was displayed is a distinctly secular environment among people seeking distinctly secular entertainment).

More than secular surroundings may affect a message. The district court in *Carpenter* held that secular circumstances may also serve to neutralize the religious message of a disputed monument. *Carpenter,* 803 F.Supp. 349–50. There, the court held that the 58-year old cross had achieved historical significance because President Franklin D. Roosevelt participated in its dedication, the dedication was a major event (it was attended by as many as 50,000 people), and because it had gained recognition as a local cultural landmark, and therefore it did not have the principal or primary effect of advancing or endorsing religion. The court also noted the "secluded" location of the public park where the cross was located. *Carpenter,* 803 F.Supp. at 349. These secular circumstances allowed the cross to pass the second prong of the *Lemon* test.

Again, we are not persuaded by the *Carpenter* court's reasoning. The court's decision that local and cultural landmark status gave secular effect to the cross in that case

smacks of bootstrapping. In *Carpenter,* the landmark status seems to have been achieved, in large part, by virtue of the duration of the display—the longer the violation, the less violative it becomes.[9] In this case, the crucifix has stood for nearly forty years, and although the Township does not argue that the duration of its display gives the crucifix landmark or cultural status, it does argue that the duration of its display reinforces its secular effect. It claims that "the very essence" of a memorial is its permanency. We believe this argument is much like the one advanced in *Carpenter*—the longer the violation, the less violative it becomes. The longer the cross is displayed in the Park, the more the effect is to memorialize rather than sermonize. We do not accept this sort of bootstrapping argument as a defense to an Establishment Clause violation, nor have we found any other case that adopted this reasoning.

We believe that the crucifix's presence in the Park conveys the primary message of the Township's endorsement of Christianity. We reached a similar conclusion in *St. Charles,* when we held that a cross crafted from strings of lights and positioned on top of the local fire station conveyed the message of a Christian system of belief to which not all St. Charles residents subscribed. *St. Charles,* 794 F.2d at 273. *See Harris,* 927 F.2d at 1412 (the incorporation of a Latin cross in a city seal conveyed an unmistakably Christian message). The D.C. District Court reached the same conclusion in *Jewish War Veterans* when it held that the primary effect of the 65-foot cross erected on a military base was a government endorsement of Christianity, despite its secular purpose. 695 F.Supp. at 14.[10]

---

9. We distinguish between the historical significance that a symbol may achieve because of an unusual or unique event or circumstances surrounding it, from the local cultural landmark significance that a symbol may achieve simply because it is displayed.

10. This case is distinct from a recent case we heard *en banc.* In *Doe v. Small,* 964 F.2d 611 (7th Cir.1992) (*en banc*), sixteen paintings depicting scenes from Christ's life were displayed in a public park during the Christmas season. For all but three of the 22 seasons that the pictures were in the park, the display was spon-

sored by private parties. A sign identified this sponsorship and indicated that no public funds were spent for the display. The plaintiffs claimed that the paintings were a violation of the Establishment Clause. The city lost in the district court, and did not appeal. Thus we were faced only with the question of whether the district court injunction was overbroad and violated the defendants' rights to free speech and free exercise of religion. We noted that the park was the location for activities by a wide variety of groups and organizations and held that denying the private parties equal access to "speak" in the

Not only do we believe that the primary message the crucifix conveys is a government endorsement of religion, we believe that the crucifix does not convey any secular message, whether remote, indirect, or incidental. *See Lynch,* 465 U.S. at 683, 104 S.Ct. at 1364. The only way to receive a secular message before 1983 was to look behind the shrubbery at the base of the crucifix to find the plaque that designated the statue is a war memorial. Since the plaque's disappearance there is no chance that anyone without special knowledge of the crucifix's history would know that it was purportedly intended to memorialize fallen soldiers.

The crucifix in Wicker Park does not bear secular trappings sufficient to neutralize its religious message. It is not seasonally displayed in conjunction with other holiday symbols. It does not have historical significance. But, it is permanent government speech in a prominent public area that endorses religion, and violates the Establishment Clause.[11]

*3. The government's excessive entanglement with religion:*

 The Supreme Court has noted that entanglement between the state and religion

park by displaying their paintings would deny them their rights to free speech and the free exercise of religion. *Id.,* at 619.

11. Both the Eleventh Circuit in *Rabun* and the D.C. District Court in *Jewish War Veterans* commented that, although not a per se rule, the use of religious means to reach a secular goal will generally result in a First Amendment violation. *See Rabun,* 698 F.2d at 1111 ("a government may not 'employ religious means to reach a secular goal unless secular means are wholly unavailing.'") (quoting *School District of Abington Township v. Schempp,* 374 U.S. 203, 294, 83

is simply a question of kind and degree. *Lynch,* 465 U.S. at 684, 104 S.Ct. at 1365. But an entanglement cannot be created merely by the filing of a lawsuit. *Id.* Because the record does not reflect any contact between the Township and the Knights concerning the design of the crucifix or its payment, we find that the Township is not excessively entangled in religion by virtue of the crucifix standing in Wicker Park.

## III.

The plaintiffs prayer for relief requested 1) a declaratory judgment stating that the statue's presence in the park is unconstitutional; 2) a permanent injunction prohibiting the Township from maintaining the statue and order its removal; and 3) damages and attorneys' fees. We REVERSE the district court and hold that the presence of the crucifix in Wicker Park violates the Establishment Clause of the First Amendment. We REMAND this case for entry of the appropriate relief.

REVERSED AND REMANDED WITH INSTRUCTIONS.

S.Ct. 1560, 1609, 10 L.Ed.2d 844 (Brennan, J., concurring)); *see also Jewish War Veterans,* 695 F.Supp. at 14 ("While federal courts for the most part have stopped short of holding the use of religious tools where secular ones will do unconstitutional per se, it seems fair to say that the needless use of means that are inherently religious makes a message of endorsement likely if not unavoidable."). Alternative means, however, are not now an element of Establishment Clause analysis. *See Lynch,* 465 U.S. at 681 n. 7, 104 S.Ct. at 1363 n. 7.